UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANDRITZ HYDRO CANADA INC., the successor to
VA TECH HYDRO CANANDA, INC.,

        Plaintiff,

  vs.

ROCHESTER GAS AND ELECTRIC CORPORATION,

        Defendant.

               Civil Action No.:
               6:20-cv-06772-FPG

## MEMORANDUM OF LAW IN SUPPORT OF
## ROCHESTER GAS AND ELECTRIC CORPORATION'S RULE 12(b) MOTION TO DISMISS

            WARD GREENBERG HELLER & REIDY LLP
            1800 Bausch & Lomb Place
            Rochester, New York 14604
            (585) 454-0700

Joseph G. Curran
Joshua M. Agins
Michael J. Adams,
*of counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    A. Andritz's October 26, 2007 Proposal to Supply
       Hydroelectric Power Generating Equipment ...................................... 2

    B. The Supplier Agreement ....................................................................... 4

    C. RG&E's Suspension Notice & Andritz's
       Acknowledgment of Suspension .......................................................... 4

    D. Andritz's Disclosure of Third-Party
       Currency Hedging Contracts ................................................................. 5

    E. Andritz's Termination of the Supplier Agreement ............................. 8

    F. Andritz's Currency Hedging Losses .................................................... 9

ARGUMENT ................................................................................................................... 9

    I.     ANDRITZ FAILS TO STATE A CLAIM FOR
           BREACH OF CONTRACT BECAUSE THE SUPPLIER
           AGREEMENT DOES NOT CREATE THE RIGHT THAT
           ANDRITZ SEEKS TO ENFORCE ..................................................... 9

           A. Paragraph 18 of the Supplier Agreement
              Does Not Permit Andritz to Terminate ................................. 10

           B. Even if Paragraph 18 Permitted Andritz
              to Terminate and Back-Charge Costs
              (It Clearly Does Not), Such Costs Could
              Not Include Hedging Losses .................................................. 12

              1. Paragraph 18 does not permit the recovery
                 of the hedging losses because they were incurred
                 after termination by Andritz ......................................... 12

              2. The Supplier Agreement does not permit
                 the recovery of the currency hedging losses
                 in connection with the termination ............................... 13

i

II.     ANDRITZ'S CLAIM FOR DECLARATORY JUDGMENT
        IS DUPLICATIVE .............................................................................17

III.    THE SUPPLIER AGREEMENT BARS ANDRITZ'S
        QUASI CONTRACT CLAIMS............................................................18

IV.     THE LIMITATION OF LIABILITY CLAUSE
        CONSTITUTES AN INDEPENDENT BAR
        TO ANDRITZ'S CLAIM FOR RECOVERY
        OF ITS HEDGING LOSSES ..............................................................19

CONCLUSION.............................................................................................20

## **TABLE OF AUTHORITIES**

**Cases**

*Ambac Assur. Corp. v. EMC Mtge. LLC*, 121 A.D.3d 514
(1st Dep't 2014) ..................................................................................11

*Aramony v. United Way of Am.*, 254 F.3d 403 (2d Cir 2001)............................15

*Biotronik v. Conor Medsystems*, 22 N.Y.3d 799 (2014)..................................19

*Corsello v. Verizon NY, Inc.*, 18 N.Y.3d 777 (2012) .........................................18

*Eastman Kodak Co. v. Bayer Corp.*, 576 F. Supp.2d 548
(S.D.N.Y. 2008 ..................................................................................16

*Grey v. FDIC*, 1998 US Dist LEXIS 12653, at *16
(S.D.N.Y. Aug. 14, 1998) ..................................................................15

*H&H Envtl. Sys. v. Evanston Ins. Co.*, 2019 US Dist LEXIS 39700, at *12
(W.D.N.Y. Mar. 12, 2019)..................................................................18

*Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Express (USA), Inc.*, 2015
US Dist LEXIS 38744, at *38 (W.D.N.Y. Mar. 26, 2015)................................16

*Katsoolis v. Liquid Media Group, Ltd.*, 2019 US Dist LEXIS
167070, at *12 (S.D.N.Y. Sep. 27, 2019) ........................................18

*Krys v. Sugrue (In re REFCO Inc.)*, 2009 US Dist LEXIS 134692,
at *83 (S.D.N.Y. Nov. 20, 2009) ......................................................16

*Loughman v Unum Provident Corp.*, 536 F. Supp. 2d 371,
(S.D.N.Y. 2008)..................................................................................15

*M&T Bank Corp. v. LaSalle Bank N.A.*, 852 F. Supp. 2d 324,
(W.D.N.Y. 2012) ......................................................................10, 12

*Metro. Life Ins. Co. v. Noble Lowndes Intl.*, 84 N.Y.2d 430 (1994) ................17

*Morlee Sales Corp. v. Mfrs. Trust Co.*, 9 N.Y.2d 16 (1961) ...........................11

*Niagara Restitution Servs. v. Degen*, 2016 U.S. Dist. LEXIS 67381,
at *8 (W.D.N.Y. May 23, 2016) ......................................................10

*Orange County Choppers, Inc. v. Olaes Enters.*, 497 F Supp. 2d 541
(S.D.N.Y. 2007) ...............................................................................................10

*Posso v. Niagara Univ.*, 2020 U.S. Dist. LEXIS 205260, at *34
(W.D.N.Y. Oct. 30, 2020) ................................................................................9

*Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F3d 125
(2d Cir. 2016)] ...............................................................................................19

*Saeed v. Kreutz*, 606 F. App'x 595(2d Cir 2015) ............................................18

*Slatt v. Slatt*, 64 N.Y.2d 966 (1985)...............................................................14

*Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231
(S.D.N.Y. 2006)..............................................................................................18

*Tigue v. Commercial Life Ins. Co.*, 219 A.D.2d 820
(4th Dep't 1995)..............................................................................................15

*VTech Holdings Ltd. v. Lucent Tech. Inc.*, 172 F. Supp. 2d 435
(S.D.N.Y. 2001) ..............................................................................................15

iv

## PRELIMINARY STATEMENT

In February 2008, Rochester Gas and Electric Corporation ("RG&E") and Andritz Hydro Canada, Inc. ("Andritz") entered into a Supplier Agreement, pursuant to which Andritz would sell equipment for upgrades to RG&E's Station 2 hydroelectric power generating plant (the "Station 2 Project"). Several months after executing the Supplier Agreement, RG&E exercised its contractual right to suspend the Station 2 Project. Unbeknownst to RG&E, however, Andritz had entered into a series of third-party currency hedging contracts—or bets on foreign currency markets—intended to protect Andritz's bottom line from currency fluctuations that could erode the value of Andritz's profits arising from the Supplier Agreement. A variety of factors—all outside RG&E's control and unrelated to Andritz's scope of work under the Supplier Agreement—determined whether Andritz would make or lose money on those third-party hedging contracts.

More than ten years after RG&E suspended the Station 2 Project, Andritz decided to terminate the Supplier Agreement, unwind its currency hedges, and attempt to back-charge RG&E for approximately one million dollars in losses allegedly[1] sustained by Andritz as a result of those third-party hedging contracts. Andritz's Complaint should be dismissed for the following reasons.

---

[1] As explained further below, the documents attached to the Complaint make clear that Andritz procured hedges against USD/CDN currency fluctuations, *and* against CDN/EUR currency fluctuations. Andritz seeks to back-charge RG&E for the losses it allegedly sustained on the USD/CDN hedges, but the Complaint is conspicuously silent as to how Andritz fared on the CDN/EUR hedges. Andritz identifies no losses on the CDN/EUR hedges, so one can reasonably assume that Andritz incurred a net *gain* on its CDN/EUR hedge positions. Of course, if these third-party hedge contracts were within the contemplation of the Supplier Agreement (they are not, for reasons explained below), Andritz would need to offset the losses its attempts to back-charge against those CDN/EUR gains.

1

*First*, the Supplier Agreement does not permit Andritz to back-charge alleged losses from currency-related bets that Andritz made on its own, for its own benefit, and entirely outside the auspices of the Supplier Agreement. The *sole* contractual provision upon which Andritz relies to support its claim does not permit Andritz to terminate the Supplier Agreement *at all*, much less to terminate and then back-charge losses sustained to unwind third-party hedging contracts. And a separate provision, which Andritz ignores and omits from the incomplete version of the Supplier Agreement attached to its Complaint, makes plain that the Supplier Agreement does not place RG&E on the hook for hedging losses that Andritz incurred in an effort to protect its bottom line.

*Second*, Andritz's claim for declaratory judgment fails as a matter of law because that claim seeks resolution of the same legal issues that will be resolved through the breach of contract claim.

*Third*, Andritz's quasi-contract claims are barred as a matter of law by the Supplier Agreement, which governs the facts, circumstances, and issues in this dispute.

*Fourth*, even if Andritz's quasi-contract claims are not barred as a matter of law by the Supplier Agreement (they are), the limitation of liability clause contained in the Supplier Agreement bars the damages sought by Andritz, i.e., recovery of hedging losses.

For these reasons, the Complaint should be dismissed.

<u>STATEMENT OF FACTS</u>

**A. Andritz's October 26, 2007 Proposal to Supply Hydroelectric Power Generating Equipment**

In the fall of 2007, in conjunction with a project to upgrade its Station 2 hydroelectric power generating facility (the "Station 2 Project"), RG&E solicited bids for the purchase of turbine generator equipment. On October 26, 2007, Andritz responded to RG&E's solicitation

2

and submitted a "Proposal for Turbine/Generator and Accessor Equipment," which described the proposed price and details of the equipment that Andritz proposed to design and sell to RG&E. Forbush Decl., Ex. A.[2]

The Proposal included a set of General Terms and Conditions, including Paragraph 3.4, which states:

> The Contract Price shall be payable in Canadian dollars and is further subject to modification to the extent of any change of foreign exchange rates (if so specified in our offer) if the Release for Manufacture is delayed beyond that quoted.

In other words, in its proposed General Terms and Conditions, Andritz reserved the right to modify the Contract Price in the event that a foreign exchange rate fluctuation impacted the real value of the Contract Price. This right to modify the Contract Price protected Andritz from the risk of currency fluctuation. The Proposal says nothing about using third-party hedging contracts to protect Andritz from currency fluctuations.

The Proposal defines the "Work" to be provided by Andritz as "the total supply of all Goods and Services required by the Contract Documents." Forbush Decl., Ex. A, ¶ 1.1. "Goods" is defined in pertinent part as "all material, machinery and equipment required to be furnished under the Contract Documents for incorporation into the Project." *Id.* "Services" are defined as "commissioning and, if stipulated in the Contract Documents, supervision of erection services to be furnished by the COMPANY but, for greater clarity, shall not include construction or installation or erection of the Goods." *Id.* The Proposal does not state or even imply that Andritz would enter into third-party currency hedging contracts, nor are such contracts included in the

---

[2] "Forbush Decl." refers to the Declaration of John R. Forbush, dated December 17, 2020, filed with RG&E's motion to dismiss.

3

price breakdown or categories of materials, equipment and services necessary to complete Andritz's contractually defined Work. *Id.* at Sections 1-9.

### B.  The Supplier Agreement

In February 2008, RG&E and VA Tech Hydro Canada, Inc., the successor to Andritz, entered into an agreement (the "Supplier Agreement"), pursuant to which Andritz would perform the "Work"—i.e., the sale of equipment and provision of services—identified in Andritz's Proposal. Dkt. 1-1. The Supplier Agreement explicitly incorporates Andritz's October 26, 2007 Proposal as "Schedule C." Dkt. 1-1 at 20. Andritz purports to attach a copy of the Supplier Agreement to its Complaint but omits Schedule C, the Proposal. *Id.* Ostensibly, Andritz believes that the Proposal's General Terms and Conditions are not part of the Supplier Agreement, or that those General Terms and Conditions are not relevant to its claim.

Pursuant to the Supplier Agreement, RG&E issued a Purchase Order ("PO") to Andritz on or about February 11, 2008, directing Andritz to proceed with the Work identified in its Proposal. Forbush Decl., Ex. B. The PO identifies the specific turbine-generator equipment that RG&E desired to purchase, and it states the agreed upon fixed Contract Price of $5,263,020.00, spare parts for a fixed price of $145,518.00, and field service support for a price not to exceed $180,705.00. *Id.*

### C.  RG&E's Suspension Notice & Andritz's Acknowledgment of Suspension

On October 24, 2008, RG&E suspended Andritz's Work in accordance with Paragraph 18 of the Supplier Agreement, which states in pertinent part:

> Purchaser may suspend or terminate this order in whole or in part for its own convenience by giving the Seller twenty-four (24) hours' notice. In such event, the Purchaser shall make payment to Seller for all costs incurred prior to such termination reasonably allocable to this order, under recognized accounting practice, together with a reasonable allowance for overhead and profit on work performed, plus all costs reasonably incurred by Seller as a

4

result of the termination (such as cancellation fees of suppliers or wrap-up costs), less disposal or retention value of termination inventory.

In its suspension notice, RG&E directed Andritz to "cease all of its activities…that will or could add further cost to the project and subsequently to RGE" and not to incur any additional costs "until further notice is received from RGE." Dkt. 1-2.

Andritz acknowledged RG&E's suspension notice in a letter dated February 13, 2009. Dkt. 1-3. In its acknowledgment, Andritz confirmed it had "immediately ceased all of its activities" and the activities of its subcontractors. *Id.* Andritz also provided an accounting of its activities performed and costs incurred prior to the suspension notice. Those costs included labor and material costs in the amount of $1,342,315.00, of which RG&E had already paid $1,117,848.00, leaving an outstanding balance of $224,467.00.

### D. Andritz's Disclosure of Third-Party Currency Hedging Contracts

In its February 13, 2009 acknowledgment of RG&E's suspension notice, Andritz disclosed that it had previously entered into third-party currency hedging contracts purportedly required by its internal "Risk Management Guidelines." Dkt. 1-3 at 4. Andritz also disclosed that it would need to terminate those hedging contracts in the event RG&E terminated the Supplier Agreement. *Id.* In the communications that Andritz attaches to its Complaint, Andritz describes the dynamics of those hedging contracts and their cost implications for Andritz. Dkt. 1-3 through Dkt. 1-6. But prior to its March 2020 communication (Dkt. 1-7), Andritz did not explicitly state it would seek to back-charge hedging losses to RG&E.

By way of additional background, Andritz is a Canadian company with its principal place of business in Quebec, Canada. Dkt. 1, ¶ 2. It does business in Canadian currency, unlike RG&E, which does business in U.S. Dollars. The Supplier Agreement states that RG&E would pay Andritz in U.S. Dollars (Forbush Decl., Ex. A at Section One ["Price Summary"]), meaning a

decrease in the value of the U.S. Dollar relative to the Canadian Dollar during the life of the project would diminish the real value of Andritz's profits in Canadian Dollars, its "home currency." Conversely, an increase in the value of the U.S. Dollar relative to the Canadian Dollar during the life of the project would *increase* the real value of Andritz's profits. In other words, the Contract Price would be worth more or less to Andritz depending on the value of the U.S. Dollar relative to the Canadian Dollar at the time of payment.

As explained in its letters attached to the Complaint, Andritz therefore procured financial instruments that allowed it to protect its bottom line by hedging against the possibility that the U.S. Dollar would decrease in value relative to the Canadian Dollar. Dkt. 1-3 and 1-5. Because Andritz also planned to procure certain materials or labor for the Station 2 Project in Europe, Andritz also purchased financial instruments that allowed it to hedge against movements in the value of the Euro relative to the Canadian Dollar. Dkt. 1-3.

Other than relatively insignificant transactional costs, the cash impact of these currency hedging contracts, according to Andritz, occurs at the time the hedging contracts are terminated. Dkt. 1-3 at 5. At the time of termination, Andritz would either make money or lose money depending on the direction of currency fluctuation during the life of the hedging contracts. For example, if the value of the U.S. Dollar decreased relative to the Canadian Dollar, Andritz would make money on those hedges, and those investment profits would offset a decrease in the real value of the RG&E Contract Price caused by the USD's decline. Dkt. 1-3 at 5 ("As a general rule, as the USD improves against the CDN dollar, the cost increases. If the Euro improves against [the] CDN dollar, it will decrease cancellation costs."); *see also* Dkt. 1-5.

As illustrated in the internal accounting document that Andritz attached to its Complaint, the outcome of these hedge contracts—i.e., whether Andritz made or lost money on them—

depended on several variables, *none of which* had anything to do with RG&E or the Supplier Agreement between RG&E and Andritz. Dkt. 1-7. Specifically, the hedge outcome depended on: (1) the duration of the hedge contracts; (2) the relative value of the U.S. Dollar and Canadian Dollar at the time Andritz cashed out its hedge; (3) the strike prices that Andritz and its counterparty (not RG&E) set for each tranche of the hedge; (4) the number of tranches that Andritz procured; and (5) the outcome of hedges that Andritz placed on other currencies, which of course depended on what other countries Andritz decided to do business in as part of its Work on the Station 2 Project. Dkt. 1-3, 1-5 and 1-7. RG&E had no involvement in any of those variables. And more importantly, the Supplier Agreement did not dictate these variables, or even mention the existence of Andritz's hedges. Dkt. 1-1.

The letters that Andritz attached to its Complaint make plain that the aforementioned variables could produce dramatically different outcomes depending on *when* Andritz chose to unwind its hedge positions. For example, Andritz explained that terminating the hedge positions in 2009 would have resulted in losses to Andritz of approximately $450,000-500,000. Dkt. 1-3 at 5 ("the current real cost to Andritz Hydro is approximately $450-500,000 USD"). In stark contrast, terminating the hedges in 2012 would have resulted in a net loss to Andritz of only $30,000. Dkt. 1-5 at 4 ("the current real cost to Andritz Hydro is approximately $30,000"). These dramatic swings in the cash-out costs of Andritz's hedging contracts are not tied to, or in any way related to, the Work that Andritz contracted to perform pursuant to the Supplier Agreement, nor can RG&E's performance or non-performance influence the value of these contracts. Moreover, Andritz could have terminated the hedges at an advantageous time, resulting in a net *profit* to Andritz.

### E.  Andritz's Termination of the Supplier Agreement

Between February 2009 and November 2019, the parties periodically communicated about the prospect of restarting the Station 2 Project. Dkt. 1-3, 1-4, 1-5. Although Andritz periodically wrote to RG&E during this ten-year project suspension, and attached those letters to its Complaint, those letters do not demand reimbursement from RG&E for costs related to these third-party hedge positions in those letters prior to March 2020. In fact, although Andritz informed RG&E of the existence of the hedges and their potential implications *for Andritz*, Andritz's written communications attached to the Complaint never explicitly stated (before March 2020) that Andritz would attempt to back-charge hedging losses.

On November 4, 2019, Andritz sent a letter to RG&E demanding that RG&E either lift the suspension or terminate the Supplier Agreement within 10 days. Dkt. 1-6. Andritz stated that if RG&E did not lift the suspension or terminate within ten days, "Andritz will deem the Contract terminated pursuant to Section 18[.]" *Id.* In this November 4, 2019 letter, Andritz did not state or even imply that it would attempt to back-charge RG&E for the hedging liability that Andritz was carrying.

Andritz sent another letter, on March 20, 2020, confirming that it had terminated the Supplier Agreement. Dkt. 1-7. Andritz stated it considered the Agreement abandoned, that RG&E purportedly breached the Agreement provision requiring time is of the essence performance by Andritz, and that RG&E is liable for anticipatory repudiation. *Id.* Andritz thereafter demanded payment for the currency hedging losses it allegedly incurred in connection with its U.S. currency hedging positions. *Id.* Andritz's March 2020 termination letter does not mention the status of its Euro currency hedging positions, which presumably resulted in positive gains, as Andritz does not seek to recover any losses on those Euro hedges. *Id.*

On April 16, 2020, RG&E responded to Andritz, denied liability for the currency hedging contract losses, and accepted Andritz's termination of the Agreement. RG&E stated, "[w]hile RG&E has never issued a termination notice under the February 2008 Agreement, we understand that Andritz has hereby confirmed that it has terminated the Agreement." Dkt. 1-8 at 4.

Andritz responded through its counsel by letter dated May 27, 2020. In that letter, Andritz reiterated that it had terminated the Agreement and requested that RG&E reimburse the currency hedging losses it had allocated to the Supplier Agreement. Forbush Decl., Ex. C.

**F. Andritz's Currency Hedging Losses**

Enclosed with the March 2020 letter is an alleged confirmation of the tranches of U.S. currency hedges purchased by Andritz and their corresponding losses at termination. In total, Andritz allegedly purchased nine tranches with maturity dates ranging from March 2008 to March 2010 and varying strike prices for each tranche. The spread of strike prices for the tranches of options purchased were presumably chosen by Andritz to mitigate the risk of a decline in the United States Dollar. The date of cancellation (value date) of the hedging contracts appears to be January 10, 2020, more than a month after Andritz's November 2019 letter notifying RG&E of Andritz's intent to terminate the Supplier Agreement. Dkt. 1-7, at 13.

<u>ARGUMENT</u>

**I. ANDRITZ FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT BECAUSE THE SUPPLIER AGREEMENT DOES NOT CREATE THE RIGHT THAT ANDRITZ SEEKS TO ENFORCE**

To state a claim for breach of contract, Andritz must allege facts demonstrating (1) the existence of an agreement; (2) adequate performance by Andritz; (3) a breach by RG&E; and (4) damages. *Posso v. Niagara Univ.*, 2020 U.S. Dist. LEXIS 205260, at *34 (W.D.N.Y. Oct. 30, 2020). "To plead these elements and survive a motion to dismiss, [Andritz] must provide specific

allegations as to an agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue." *Niagara Restitution Servs. v. Degen*, 2016 U.S. Dist. LEXIS 67381, at *8 (W.D.N.Y. May 23, 2016). Where, as here, the contractual provisions identified by the plaintiff do not support the alleged claim, pre-answer dismissal is required. *See, e.g.*, *M&T Bank Corp. v. LaSalle Bank N.A.*, 852 F. Supp. 2d 324, 334 (W.D.N.Y. 2012); *Orange County Choppers, Inc. v. Olaes Enters.*, 497 F Supp. 2d 541, 554 (S.D.N.Y. 2007).

### A. Paragraph 18 of the Supplier Agreement Does Not Permit Andritz to Terminate

Andritz alleges that Paragraph 18 of the Supplier Agreement entitles it to recover its currency hedging losses. Dkt. 1 at ¶¶ 50-51. This is simply not true, and the Court's inquiry can begin and end with the plain language of Paragraph 18. Paragraph 18 permits RG&E (not Andritz) to suspend or terminate the Supplier Agreement, and for Andritz to recover certain costs in the event of a termination by RG&E (not Andritz). Paragraph 18 states:

> **Purchaser** may suspend or terminate this order in whole or in part for its own convenience by giving the Seller twenty-four (24) hours' notice. In such event, the Purchaser shall make payment to Seller for all costs incurred prior to such termination reasonably allocable to this order, under recognized accounting practice, together with a reasonable allowance for overhead and profit on work performed, plus all costs reasonably incurred by Seller as a result of the termination (such as cancellation fees of suppliers or wrap-up costs), less disposal or retention value of termination inventory.

Dkt. 1-1, ¶ 18 (emphasis added).

Here, the documents that Andritz attached to its Complaint establish that Andritz terminated the Agreement through its November 4, 2019 letter and confirmed this termination in its March 20, 2020 letter. *See* Dkt. 1-6 and 1-7. At no point did RG&E give notice of termination

to Andritz—a precondition to back-charges under Paragraph 18. RG&E highlighted this fact in

its April 16, 2020 letter to Andritz:

> Finally, we gather from your most recent letter that Andritz considers the February 2008 Agreement to be terminated. While RG&E has never issued a termination notice under the February 2008 Agreement, we understand that Andritz has hereby confirmed that it has terminated the Agreement.

Dkt. 1-8, at 4.

The plain, unambiguous language of Paragraph 18 forecloses Andritz's claim because it

does not permit Andritz to terminate and back-charge.[3] The Court's analysis truly can end here.

Moreover, RG&E's suspension is not relevant here because the plain, unambiguous

language of Paragraph 18 permits Andritz to recover certain costs (not hedging losses) only after

*termination* by RG&E, not suspension by RG&E. *See Morlee Sales Corp. v. Mfrs. Trust Co.*, 9

N.Y.2d 16, 19 (1961) ("It is axiomatic that a contract is to be interpreted so as to give effect to

the intention of the parties as expressed in the unequivocal employed."). The omission of the

word "suspension" in the second sentence of Paragraph 18 (even though "suspension" is

included in the first sentence of that same paragraph) confirms that the parties did not intend for

Andritz to recover costs incurred in connection with a mere suspension by RG&E. *See Ambac*

*Assur. Corp. v. EMC Mtge. LLC*, 121 A.D.3d 514, 518 (1st Dep't 2014) ("the omission of a term

---

[3] As indicated previously, Andritz filed a copy of the Contract but omitted Schedule C, its proposal. Dkt. 1-1 at 20. The Court can (and should) presume from Andritz's tactical omission of the Schedule that Andritz does not believe that the General Terms and Conditions of Schedule C support Andritz's claim. And on this, the parties agree. But the Court may note that Paragraph 17 of the Proposal (Schedule C) constitutes *additional* evidence that Paragraph 18 does not apply here. Paragraph 17 of the Proposal (Schedule C) purports to provide Andritz the right to terminate for convenience under certain circumstances, such as a prolonged suspension by RG&E. And the inclusion of this right in the Proposal (Schedule C) demonstrates that Andritz knew how to write a contract provision giving itself such a right. But Paragraph 18—the provision on which Andritz relies—provides no such right to Andritz, and Paragraph 17 also does not permit recovery of the hedging losses that Andritz seeks to recover—presumably the reason why Andritz omitted the Schedule from its Complaint.

from the sentence at issue in a contract, especially when that term is used multiple times in the same paragraph, must be deemed an intentional choice of the parties to the agreement.").

Because the contractual provision upon which Andritz purports to rely does not provide for the relief that Andritz seeks and was not breached by RG&E, the breach of contract claim must be dismissed. *M&T Bank Corp.*, 852 F. Supp. 2d at 334 (dismissing breach of contract claim where plaintiff failed to identify a specific provision that was breached).

### B. Even if Paragraph 18 Permitted Andritz to Terminate and Back-Charge Costs (It Clearly Does Not), Such Costs Could Not Include Hedging Losses

Even if the Court were to read into Paragraph 18 a right of termination for Andritz, or to permit Andritz to recover costs in the event of a suspension by RG&E, Paragraph 18 would nonetheless not provide for recovery of hedging losses. As discussed below, in the event of *termination* by *RG&E*, Paragraph 18 permits the recovery of two categories of costs: (1) those that are "incurred prior to termination and are reasonably allocable under this order," and (2) those that are "reasonably incurred by [Andritz] as a result of the termination." Neither category permits Andritz to recover its hedging losses.

#### 1. Paragraph 18 does not permit the recovery of the hedging losses because they were incurred after termination by Andritz

Paragraph 18 states, in pertinent part, that RG&E may suspend or terminate, and that "[i]n such event" Andritz may recover "costs incurred *prior to such termination* reasonably allocable under this order…." Andritz terminated the Supplier Agreement in November 2019 (Dkt. 1-6) and then cancelled the hedging contracts in January 2020. Dkt. 1-7. Paragraph 18 explicitly limits back-charges to those costs incurred *prior to* termination, not after. There is nothing in Paragraph 18 to suggest that RG&E could or should continue to be on the hook for

additional "costs…reasonably allocable under this order" incurred *after* the date of a termination by RG&E (let alone after a termination by Andritz).

Crediting Andritz's interpretation of Paragraph 18 would eliminate the temporal limitation stated in Paragraph 18: "Purchaser may suspend or terminate this order . . . In such event the Purchaser shall make payment to the Seller for all costs **incurred prior to such termination…**" The hedge losses that Andritz now attempts to back-charge to RG&E arose in January 2020—approximately eleven years after RG&E issued its Suspension Notice, and two months after *Andritz* gave notice of its termination. (Dkts. 1-6 and 1-7, at 13). These costs therefore fall outside the ambit of costs incurred "prior to" termination as set forth in Paragraph 18.

### 2. The Supplier Agreement does not permit the recovery of the currency hedging losses in connection with the termination

To the extent Andritz alleges that the currency hedging losses are costs "reasonably incurred by Seller as a result of the termination," the recovery of such losses is not contemplated by the language of the Supplier Agreement as evidenced by the more specific terms included in the Proposal and Supplier Agreement.[4] In other words, Andritz is attempting to read into Paragraph 18 a right that does not exist while ignoring a separate explicit provision dealing with this exact issue.

Andritz's omission of Schedule C is notable because Schedule C contains the *only* language in the entire Supplier Agreement that speaks to the issue of currency fluctuation. Indeed, the parties recognized that, because Paragraph 18 permits RG&E to suspend indefinitely

---

[4] Because Andritz, not RG&E, terminated the Supplier Agreement, Andritz cannot recover under this portion of Paragraph 18 which refers to the "termination" referenced in the first sentence of Paragraph 18. As discussed above, Paragraph 18 applies exclusively to terminations by RG&E, and does not apply where Andritz terminates.

and without cause, Andritz would be subject to the risk of foreign exchange rate fluctuation in the event of a lengthy delay prior to payment. The parties agreed to protect Andritz from such risk by permitting price modifications commensurate with any exchange rate fluctuation. Specifically, Paragraph 3.4 of the Proposal provides Andritz with a specific remedy to protect itself from the risk of a currency exchange rate fluctuation:

> The Contract Price shall be payable in Canadian dollars and ***is further subject to modification to the extent of any change of foreign exchange rates*** (if so specified in our offer) if the Release for Manufacture is delayed beyond that quoted.

Forbush Decl., Ex. A, ¶ 3.4 (emphasis supplied).

As written, Paragraph 3.4 entitles Andritz to a Contract Price adjustment in the event of changes in any foreign currency exchange rate beyond the date of performance quoted by Andritz. "Release for Manufacture" is defined by the Proposal as "a document issued by [RG&E] authorizing [Andritz] to begin manufacturing of the Goods. The date of issue shall become the first day from which 'Contract time' will be measured." Forbush Decl., Ex. A, ¶1.1. The Proposal reflects that the manufacture of the Goods would occur over a 570-day period ("Contract time"). *Id*. at Section 5. The Proposal identified a foreign currency when it quoted the price in United States Dollars.[5] *Id.* at Section 1. Accordingly, in the event that Andritz's performance took more than 570 days from the date of RG&E's Purchase Order, Andritz could increase the Contract Price to account for any fluctuation in the exchange rate between the United States Dollar and Canadian Dollar.

Courts "are required to discern the intent of the parties, to the extent that the parties evidenced what they intended by what they wrote." *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985).

---

[5] Had Andritz, a Canadian company, quoted the price in Canadian dollars there would be no concern regarding currency exchange rate fluctuations and Paragraph 3.4 would not apply. Paragraph 3.4 applies where the price is paid in currency other than Canadian dollars.

Words and phrases in the contract should be afforded their plain and ordinary meaning and the Court "should not rewrite an unambiguous agreement." *Grey v. FDIC*, 1998 US Dist LEXIS 12653, at *16 (S.D.N.Y. Aug. 14, 1998); *see also Tigue v. Commercial Life Ins. Co.*, 219 A.D.2d 820, 821 (4th Dep't 1995) ("…the court must ascertain the intent of the parties from the plain meaning of the language employed, giving terms their plain, ordinary, popular and non-technical meanings.").  And when discerning the rights of the parties to an agreement, the Court should also afford specific provisions greater weight than general language. *See Loughman v. Unum Provident Corp.*, 536 F. Supp. 2d 371, 376 (S.D.N.Y. 2008). Even where there is no conflict between contract provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was "directed solely toward the matter to which the specific words or clause relate." *Aramony v. United Way of Am.*, 254 F.3d 403, 414 (2d Cir 2001). These well-established principles of contract construction require the Court to reject Andritz's effort to read into Paragraph 18 a right that does not exist.

Paragraph 3.4 constitutes the mechanism expressly agreed to by the parties to allocate the risk of currency fluctuation. *See VTech Holdings Ltd. v. Lucent Tech. Inc.*, 172 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) ("…the essence of contract interpretation . . . is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract."). The parties intended for Andritz to protect itself from currency exchange fluctuations through Contract Price adjustments, not through the purchase of extra contractual currency hedging options that could result in large losses or profit swings depending on a variety of factors outside RG&E's control and unknown to RG&E.

Andritz recognized the purpose of Paragraph 3.4 of Schedule C. In its April 2012 letter, Andritz stated that the parties would need to modify the Contract Price in the event that RG&E

lifted the suspension to account for fluctuations in the value of the Euro. Dkt. 1-5, at 3 ("…the turbine scope will then require price adjustment not just due to the escalation formula above but additionally upon the currency exchange rates with the Euro at the time the suspension is lifted.").

Because Andritz bargained for and received the *specific* right to adjust the Contract Price based on currency fluctuations, Paragraph 18 should not be interpreted to permit Andritz to back-charge currency hedging losses it allegedly incurred to hedge currency risk—a risk that Paragraph 3.4 of Schedule C covers by permitting Contract Price adjustment. *See Jim Ball Pontiac-Buick-GMC, Inc. v. DHL Express (USA), Inc.*, 2015 US Dist LEXIS 38744, at *38 (W.D.N.Y. Mar. 26, 2015) (*citing Eastman Kodak Co. v. Bayer Corp.*, 576 F. Supp.2d 548, 552 (S.D.N.Y. 2008) ("court required to interpret contract in a manner 'that makes sense in the context of the entire agreement'")).

Construing Paragraph 18 as Andritz proposes in its Complaint is impermissible for the additional reason that doing so would render Paragraph 3.4 superfluous. *See Krys v. Sugrue (In re REFCO Inc.)*, 2009 US Dist LEXIS 134692, at *83 (S.D.N.Y. Nov. 20, 2009) (interpretation of contract that renders phrase superfluous is disfavored by law). If Andritz could recover hedging losses, Andritz would have no use for Paragraph 3.4, rendering that provision superfluous.

Lastly, an interpretation of the Proposal that permits Andritz to recover currency hedging losses *and* adjust the Contract Price in the event of an exchange rate change would be inequitable and provide Andritz with an unreasonable economic advantage over RG&E. *See Metro. Life Ins. Co. v. Noble Lowndes Intl.*, 84 N.Y.2d 430, 438 (1994) ("A court will endeavor to give the contract construction most equitable to both parties instead of the construction which will give

16

one of them an unfair and unreasonable advantage over the other…Language in contracts placing one party at the mercy of the other is not favored by the courts."). Adopting Andritz's interpretation would allow Andritz to profit on the extra contractual currency hedges, obtain the benefit from any increase in the value of the USD during the project, adjust the price if the USD were to fall in value, and in the event of termination, saddle RG&E with any losses on its extra contractual investments. As a sophisticated commercial entity, RG&E would not have agreed (and did not agree) to insure Andritz's third-party investments over which it exercised no control and would not have profited or benefited from. Accordingly, an interpretation that would entitle Andritz to a price increase as well as recovery of currency hedging losses and/or the retention of any profits it realized on the currency hedging contracts should be avoided here.

## II.  ANDRITZ'S CLAIM FOR DECLARATORY JUDGMENT IS DUPLICATIVE

Andritz's second claim seeks a declaratory judgment that the currency hedging losses are a payment obligation for which RG&E is liable in connection with the suspension of the Supplier Agreement under paragraph 18. *See* Compl. at ¶ 66.

Where a claim for declaratory judgment is brought simultaneously with a claim for breach of contract, the declaratory judgment action will not survive if it seeks resolution of legal issues that will be necessarily resolved by the other causes of action. *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006).  Here, the declaratory judgment claim is duplicative of the breach of contract claim as it seeks precisely the same relief as the breach of contract claim. Under both claims, Andritz seeks to recover payment of the currency hedging losses on the theory that Paragraph 18 is applicable. Even the amount sought to be recovered under both claims is identical. Where a declaratory judgment action is duplicative of the

adjudication of a breach of contract claim, dismissal is appropriate. *H&H Envtl. Sys. v. Evanston Ins. Co.*, 2019 US Dist LEXIS 39700, at \*12 (W.D.N.Y. Mar. 12, 2019).

Accordingly, Andritz's second cause of action should be dismissed.

### III. THE SUPPLIER AGREEMENT BARS ANDRITZ'S QUASI CONTRACT CLAIMS

It is well-settled in New York that claims sounding in quasi contract are barred as a matter of law where a written agreement between the parties governs the subject matter. *Saeed v. Kreutz*, 606 F. App'x 595, 597 (2d Cir 2015) ("[a] contract cannot be implied in fact where there is an express contract covering the subject matter involved."); *see also Katsoolis v. Liquid Media Group, Ltd.*, 2019 US Dist LEXIS 167070, at \*12 (S.D.N.Y. Sep. 27, 2019) ("valid written agreement precludes recovery under . . . promissory estoppel where the agreement concerns the same subject matter as the promissory estoppel claim."); *see also Corsello v. Verizon NY, Inc.*, 18 N.Y.3d 777, 790 (2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.").

Andritz's quasi-contract claims all relate to the same subject matter that forms the basis of its breach of contract claim, including the amount of damages sought. Specifically, Andritz alleges it incurred currency hedging losses due to the termination of the Supplier Agreement. As discussed above, the Supplier Agreement governs what costs and damages are recoverable by Andritz in the event of a termination. Andritz does not dispute this and in fact incorporates and realleges its allegation that the Supplier Agreement is valid and enforceable in connection with each of its quasi contract claims.

Accordingly, because the claims are duplicative of the breach of contract claim and based on the same conduct governed by the Supplier Agreement, Andritz's claims for implied-in-fact contract, unjust enrichment and promissory estoppel should be dismissed.

#### IV. THE LIMITATION OF LIABILITY CLAUSE CONSTITUTES AN INDEPENDENT BAR TO ANDRITZ'S CLAIM FOR RECOVERY OF ITS HEDGING LOSSES

Paragraph 41 of the Supplier Agreement states in pertinent part that "…in no event shall either party be liable to the other or any of its affiliates related in any way to this Supplier Agreement or performance thereof for any incidental, special, indirect, punitive or consequential damages of any kind…" Dkt. 1-1, ¶ 41.

Such clauses are a recognized and enforceable means of allocating risk between the parties in the event a contract is not performed. *See Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F3d 125, 138 (2d Cir. 2016). It is also well-settled that under New York law, consequential damages or special damages are those that do not directly flow from the breach of contract. *See Biotronik v. Conor Medsystems*, 22 N.Y.3d 799, 805 (2014). Where damages stem from collateral business transactions, they may only be recovered where the damages were caused by the breach and the damages were fairly within the contemplation of the parties. *Id.* at 806.

Here, Andritz's currency hedging losses do not flow directly from any alleged breach of the Supplier Agreement by RG&E. Rather, these losses were incurred extra contractually by Andritz and were not necessary to accomplish its performance under the Supplier Agreement. As discussed, neither the Supplier Agreement nor the Proposal evidence any contemplation that such losses would necessarily be incurred by Andritz in connection with the Supplier Agreement. In fact, Paragraph 3.4 of the Proposal makes it clear that the parties did not contemplate that Andritz would incur such losses. Moreover, there is no evidence that any alleged breach by RG&E caused the damages claimed by Andritz nor has Andritz alleged that it was required to cancel the currency hedging contracts because of any alleged breach by RG&E.

Accordingly, even if Andritz has alleged a valid quasi-contract claim (it has not), its claims must still be dismissed because recovery of the consequential damages it seeks is barred by the Supplier Agreement's limitation of liability clause.

## CONCLUSION

Based upon the foregoing, the Complaint should be dismissed.

December 18, 2020
Rochester, New York                           **WARD GREENBERG HELLER & REIDY LLP**

                                                    _s/Joshua M. Agins_
                                                  Joseph G. Curran
                                                  Joshua M. Agins
                                                  Michael J. Adams

                                                  1800 Bausch & Lomb Place
                                                  Rochester, New York 14604
                                                  (585) 454-0700
                                                  jcurran@wardgreenberg.com
                                                  jagins@wardgreenberg.com
                                                  madams@wardgreenberg.com