UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANDRITZ HYDRO CANADA INC., the successor to
VA TECH HYDRO CANADA, INC.

               Plaintiff,

      v.

ROCHESTER GAS AND ELECTRIC
CORPORATION,

               Defendant.

_____

Civil Action No.:
6:20-cv--06772-FPG

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Phillips Lytle LLP
Attorneys for Plaintiff
*Andritz Hydro Canada Inc.*
28 East Main Street
Suite 1400
Rochester, NY  14614-1935
Telephone No. (585) 238-2000

Chad W. Flansburg
Tara Ward
- Of Counsel -

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES......................................................... iii

PRELIMINARY STATEMENT ..................................................... 1

STATEMENT OF FACTS ........................................................... 3

    A.    The parties.................................................................. 3

    B.    The Agreement and operative terms ........................... 3

    C.    Andritz's currency hedging contracts and RGE's knowledge of these contracts .......................................................... 6

    D.    RGE's suspension of the Project for its convenience and Andritz's notification that the currency hedging contracts were being rolled over with continued charges and additional cost in the event of termination ................................................................ 6

    E.    RGE's termination for convenience and currency hedging costs .................. 9

    F.    Andritz's Complaint and RGE's Motion to Dismiss.....................................11

LEGAL STANDARD ................................................................11

ARGUMENT ...........................................................................13

POINT I    ANDRITZ HAS STATED A CLAIM FOR BREACH OF CONTRACT...13

    A.    Andritz has adequately alleged breach of the Agreement. .................13

    B.    RGE's arguments improperly attempt to treat this Motion as a bench trial. ..........................................................................14

        1.    RGE terminated the Agreement in accordance with Section 18……...........................................................14

        2.    Andritz is entitled to receive from RGE the termination costs related to the foreign currency contracts. ..............................17

            a.    The foreign currency contracts were incurred prior to termination and reasonably allocable to the order. ......18

            b.    The termination costs for the foreign currency contracts were reasonably incurred by Andritz as a result of the termination..............................................................21

        c.     Under the "inconsistency" provision, the Agreement takes precedence over any conflicting terms. ...............24

        d.     In the alternative, assuming *arguendo* that the Court does not adopt Andritz's contract construction, Section 18 is ambiguous and issues of fact exist...............................25

POINT II     THE LIMITATION OF LIABILITY CLAUSE IS INAPPLICABLE TO THIS ACTION AND DOES NOT BAR RECOVERY ........................25

POINT III    THE QUASI-CONTRACT CLAIMS ACCOUNT FOR RGE'S POST-SUSPENSION ACQUIESCENCE TO THE HEDGING COSTS AND ARE THEREFORE PROPER ALTERNATIVE CAUSES OF ACTION. ................................................................................27

CONCLUSION ............................................................................................30

# TABLE OF AUTHORITIES

Page

**Cases**

*Allaire Corp. v. Okumus*,
  433 F.3d 248 (2d Cir. 2006) ........................................................12

*Am. List Corp. v. U.S. News & World Report*,
  75 N.Y.2d 38 (1989)....................................................................26

*Arc Elec. Constr. Co. v. George A. Fuller Co., Inc.*,
  24 N.Y.2d 99 (1969).............................................17, 22, 23, 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................12

*Baker v. State of New York*,
  77 A.D. 528 (3rd Dep't 1902) ....................................................16

*Bank of New York Tr., N.A. v. Franklin Advisors, Inc.*,
  522 F. Supp. 2d. 632 (S.D.N.Y. 2007).......................................12

*Bell v. Leakas*,
  No. 90 Civ. 7981 (LMM), 1993 WL 77320 (S.D.N.Y. March 13, 1993).......... 12, 14, 15

*Boston Concessions Grp., Inc. v. Criterion Ctr. Corp.*,
  250 A.D.2d 435 (1st Dep't 1998) ...............................................16

*Brand Inv. Co. v. United States*,
  58 F.Supp. 749 (Ct. Cl. 1944), *cert. denied*, 324 U.S. 850 (1945) ...................................20

*CompuDyne Corp. v. Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006)........................................12

*Corallo v. Merrick Cent. Carburetor, Inc.*,
  733 F.2d 248 (2d Cir. 1984) ......................................................17

*DiFolco v. MSNBC Cable LLC*,
  622 F.3d 104 (2d Cir. 2010) ......................................................13

*District of Columbia v. Org. for Env't Growth, Inc.*,
  700 A.2d 185 (D.C. App. 1997) .................................................17

*Fischer & Mandell LLP v. Citibank, N.A.*,
  632 F.3d 793 (2d Cir. 2011) ......................................................13

*Goldin-Feldman Co. v. Blum & Fink, Inc.,*
    No. 99 Civ. 11637 (VM), 2000 WL 1182798 (S.D.N.Y. Aug. 18, 2000) ...................... 14

*Hellenic Lines v. Gulf Oil Corp.,*
    340 F.2d 398 (2d Cir. 1965) ........................................................................ 15

*John William Costello Assocs. v. Standard Metals Corp.,*
    99 A.D.2d 227 (1st Dep't 1984) .................................................................. 15

*Joseph Sternberg, Inc. v. Walber 36th St. Assocs.,*
    187 A.D.2d 225 (1st Dep't 1993) ................................................................. 28

*Latham Land I, LLC v. TGI Friday's Inc.,*
    96 A.D.3d 1327 (3d Dep't 2012) .................................................................. 26

*In re: Long Island Lighting Co. v. Assessor for Town of Brookhaven,*
    202 A.D.2d 32 (2d Dep't 1994) ................................................................... 26

*Miller v. Schloss,*
    218 N.Y. 400 (1916) .................................................................................. 29

*Nat'l City Com. Cap. Co., LLC v. Glob. Golf, Inc.,*
    No. 09-CV-0307(JFB)(AKT), 2009 WL 1437620 (E.D.N.Y.
    May 20, 2009) .......................................................................................... 29

*Nolan Bros., Inc. v. United States,*
    437 F.2d 1371 (Ct. Cl. 1971) ................................................................. 19, 20

*Oakgrove Constr., Inc. v. Genesee Valley Nurseries, Inc.,*
    39 A.D.3d 1283 (4th Dep't 2007) ................................................................ 24

*Powers v. Stanley Black & Decker, Inc.,*
    137 F.Supp. 3d 358 (S.D.N.Y. 2015) ........................................................... 26

*Readick v. Avis Budget Grp., Ins.,*
    No. 12 Civ. 3988(PGG), 2013 WL 3388225 (S.D.N.Y July 3, 2013) ........................... 12

*Reiss v. Fin. Performance Corp.,*
    97 N.Y.2d 195 (2001) ................................................................................ 25

*Salahuddin v. Cuomo,*
    861 F.2d 40 (2d Cir. 1988) ......................................................................... 13

*Seiden Assocs., Inc. v. ANC Holdings, Inc.,*
    754 F. Supp. 37 (S.D.N.Y. 1991) ................................................................. 28

*Slatt v. Slatt,*
    64 N.Y.2d 966 (1985) ................................................................................ 18

*Smith v. Kirkpatrick,*
    305 N.Y. 66 (1953), *overruled in part, on other grounds, O'Brien v.
    City of Syracuse,* 54 N.Y.2d 353 (1981) .........................................................28

*W.B. David & Co., Inc. v. DWA Commc'ns, Inc.,*
    No. 02 Civ. 8479 (BSJ), 2004 WL 369147 (S.D.N.Y. Feb. 26, 2004)............................13

*Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.,*
    112 A.D.3d 78 (1st Dep't 2013) ..................................................................24

*Water St. Dev. Corp. v. City of New York,*
    220 A.D.2d 289 (1st Dep't 1995) .................................................................23

*Watermelons Plus, Inc. v. New York City Dept. of Educ.,*
    76 A.D.3d 973 (2d Dep't 2010).....................................................................17

*Wenig v. Glens Falls Indem. Co.,*
    294 N.Y. 195 (1945).................................................................................23

*Westchester Resco Co. v. New England Reins.,*
    648 F.Supp. 842 (S.D.N.Y. 1986), *aff'd,* 818 F.2d 2 (2d Cir. 1987) ...........................16

*White Buffalo Constr., Inc. v. United States,*
    52 Fed.Cl. 1 (Ct. Cl. 2002)..................................................................... 20, 21

**Statutes**

Fed. R. Civ. P. Rule 8...............................................................................27, 28

Fed. R. Civ. P. Rule 12(b)(6)...................................................................2, 4, 11, 17

**Other Authorities**

Barry B. Bramble and Michael T. Callahan, *Construction Delay Claim,* § 12.19
    Owner's Damages (6th ed. 2020-2 Supp.)............................................................27

https://www.merriam-webster.com/dictionary/costs ....................................................19

Philip L. Bruner and Patrick J. O'Connor, Jr., 2 Bruner and O'Connor on
    Construction Law, § 18:45 (August 2020 update) .................................................24

Philip L. Bruner and Patrick J. O'Connor, Jr., 2 Bruner and O'Connor on
    Construction Law § 5.268 § 14.4.1 (August 2020 Update)..........................................20

Restatement (Second), Contracts § 344(b) (1981) ....................................................24

S. Biser, R. Rubin & C. Brown, *New York Construction Law Manual, Contractual
    right of termination - For convenience,* § 4.4 (2d ed. June 2020) ..............................17

**PRELIMINARY STATEMENT**

Plaintiff Andritz Hydro Canada Inc. ("Andritz") incurred foreign currency hedging contract costs in the amount of 1,126,970.48 CAD prior to defendant Rochester Gas & Electric Corporation's ("RGE") termination for convenience of its upgrade and expansion ("Project") of a hydroelectric power station ("Station 2"). RGE is unquestionably liable for these costs under the parties' agreement entitled "General Terms & Conditions, Rochester Gas & Electric Corporation, Station 2 New Unit Project for Supply of Generating Unit," dated February 5, 2008 (the "Agreement"). Under the "Termination for Convenience" provision of the Agreement ("Section 18" or "Termination for Convenience provision"), RGE is broadly obligated to make payment to Andritz for "all costs" incurred upon a convenience termination or suspension.

The Agreement obligated Andritz to procure certain high-value items and engineering from Canada and Europe in foreign currency. Because of this, Andritz entered into standard foreign currency contracts to seek to eliminate or "hedge" its foreign currency risk resulting from these foreign currency transactions. Andritz's purchase of these foreign currency hedging contracts is a standard practice of which RGE was aware.

Several months after entering into the Agreement, RGE suspended the Project on October 24, 2008, for its convenience. For the next eleven plus years, the Project remained in suspension with RGE periodically advising Andritz that it intended to continue or restart the Project. During this suspension-period, Andritz maintained and rolled over the foreign currency hedging contracts just as it did with other materials on hand for the Project. Andritz repeatedly advised RGE of the same, to which RGE assented. Ultimately, in late 2019 RGE advised Andritz that it would not lift the suspension on the Project, and

the Agreement was thereafter terminated for RGE's convenience.  Andritz submitted a claim for the closeout costs of the foreign currency contracts in the amount of 1,126,970.48 CAD, which RGE refused to pay.

Andritz's Complaint asserts five claims against RGE for breach of contract, declaratory judgment,[1] implied-in-fact contract, unjust enrichment, and promissory estoppel.  Dkt. 1.  RGE moved to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6) (the "Motion"). Dkt. 9.

RGE's Motion should be denied in its entirety for the following reasons discussed below.

First, Andritz has undeniably stated a claim for breach of contract.  Simply put, in drawing all reasonable inferences in favor of Andritz, as this Court must do at this stage of the proceedings, RGE materially breached the Termination for Convenience provision by failing to pay Andritz the foreign currency hedging costs in the amount of 1,126,970.48 CAD.  Section 18 unquestionably obligates RGE to pay these costs upon the suspension or termination of the Agreement for RGE's convenience.

Second, the Limitation of Liability clause of the Agreement is immaterial to the instant dispute and does not bar recovery.  Andritz is entitled to the hedging costs under the mandatory payment obligations of Section 18.  The Limitation of Liability clause cannot apply to bar recovery of hedging costs because it would otherwise operate as an impermissible forfeiture.  In addition, the foreign currency hedging costs are nothing more than financing costs and direct damages under well-settled law.  Thus, these foreign

---

[1] Andritz withdraws the second claim of the Complaint for declaratory judgment.

currency hedging costs are simply direct damages that are not barred by the Limitation of Liability clause.

Third, at this stage of the litigation, the quasi-contract claims contained in claims three through five of the Complaint are not barred by the mere existence of the Agreement.  Indeed, if, as RGE claims, recovery of costs Andritz incurred under foreign currency hedging contracts is precluded under the Termination for Convenience provision of the Agreement, Andritz will require the alternative quasi-contract theories of liability to account for RGE's post-suspension assent to liability for hedging costs and to make Andritz whole.

For these reasons, RGE's Motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.    The parties

Andritz is a foreign corporation incorporated and existing under the laws of the province of New Brunswick, Canada with a principal place of business in Quebec, Canada.  Dkt. 1, ¶ 2.  Andritz designs, manufactures, and supplies various equipment and services to hydropower plants in Canada and the US.  Dkt. 1, ¶ 8.  RGE is a utility service provider for nearly 700,000 electricity and natural gas customers in and around Rochester, New York.  Dkt. 1, ¶ 9.  RGE owns and operates Station 2, located on the Genesee River in Rochester, New York.  Dkt. 1, ¶ 10.

### B.    The Agreement and operative terms

In or about 2008, RGE commenced the Project and sought to install a new turbine-generator and associated equipment/systems (the "Generation Unit").  Dkt. 1, ¶ 11. In connection with the supply of this Generation Unit, VA Tech Hydro Canada, Inc. ("VA

Tech"), the predecessor company of Andritz, and RGE entered into the Agreement.  Dkt. 1, ¶ 12 & Dkt. 1-1.

    The Agreement was to "serve as a blanket or master contract covering all purchase orders submitted by [RGE]." Dkt. 1-1, p. 4.  Andritz was to furnish the "materials and/or equipment as specified on [RGE's] Purchase Order and any specifications attached thereto, and in accordance with the provisions of this Agreement." *Id.*  The price of the Agreement was firm or fixed and in the amount as stated on the face of Purchase Order ("PO").  Dkt. 1-1, p. 6.  In accordance with the Agreement, RGE issued a PO to Andritz on or about February 11, 2008, in the fixed amount of $5,589,243.00, which covered the turbine-generator for the fixed price of $5,263,020.00, spare parts for the fixed price of $145,518.00, and field services support for a price not to exceed $180,705.00.  Dkt. 9-4, p. 2.  The Agreement required payment to be made in U.S. Dollars.  *Id.*; Dkt. 1-8, p. 3.  With regard to the parties' performance, the Agreement expressly stated that **"TIME IS OF THE ESSENCE."**  Dkt. 1-1, § 8.  Andritz also provided certain Performance Guarantees and warranties for its work. Dkt. 1-1, § 39(D).  The Agreement contains a Limitation of Liability clause that states, "In no event shall either party be liable to the other or any of its affiliates related in any way to this Agreement or performance thereof for any incidental, special, indirect, punitive or consequential damages of any kind, or for any lost profits, revenue or use, or loss or damage associated with shutdown, decreased capacity or inability to run the equipment at full capacity."  Dkt. 1-1, § 41.

    Importantly, the Agreement exclusively provided RGE the right to suspend or terminate the Agreement in whole or part for its convenience.  Dkt. 1-1, § 18.  In the event

- 4 -

of such suspension or termination by RGE, Section 18 of the Agreement provided for the

following mandatory payment obligations to be made to Andritz:

> Purchaser may suspend or terminate this order in whole or in part for its own convenience by giving the Seller twenty-four (24) hours notice.  In such event the Purchaser shall make payment to the Seller for all costs incurred prior to such termination reasonably allocable to this order, under recognized accounting practice, together with a reasonable allowance for overhead and profit on work performed, plus all costs reasonably incurred by Seller as a result of the termination (such as cancellation fees of suppliers or wrap-up costs), less disposal or retention value of termination inventory.  This provision shall not be deemed to limit or otherwise affect [RGE's] right to terminate this Agreement for breach or default by the Seller.

Dkt. 1-1, § 18.

The Agreement identified certain "Contract Documents" that were

incorporated by reference and contained a conflict or "inconsistency" provision, stating

that, "In the event of a conflict between terms contained in two or more Contract

Documents," the conflict would be resolved in accordance with the order of precedence

identified.  Dkt. 1-1, § 2.  The Agreement was the first priority of precedence.  Andritz's

proposal of October 26, 2007 ("Proposal"), that was submitted in response to RGE's

invitation is also a Contract Document and was listed fourth in the order of precedence.

Dkt. 1-1, § 2.  Included within the Proposal were, among other things, a price summary

(Section 1), Technical and Performance Data (Section 2), Equipment Description (Section

3), Guarantees (Section 4), Applicable Schedule (Section 5), Shop Inspection and Testing

(Section 6), Commercial Terms and Conditions (Section 9), and Exhibits (Section 10).  Dkt.

9-3.   The Commercial Terms and Conditions (Section 9) of the Proposal consist entirely of

a "General Terms and Conditions" form containing boilerplate terms and provisions

("Boilerplate Terms").  The Boilerplate Terms are a generic form that describes the parties

only as "Company" and "Customer" and does not provide any specific details for the Project.  Dkt. 9-3, pp. 42-48.

**C.     Andritz's currency hedging contracts and RGE's knowledge of these contracts**

The Agreement required Andritz to procure certain high-value items and engineering from Canada and Europe in foreign currency.  Dkt. 1, p. 3-4.  For example, the Proposal speaks to Andritz making use of its "global sourcing network," certain European Standards being applicable, and equipment being designed in, among other places, Ravensburg, Germany.  Dkt. 9-3, p. 3.  Andritz does business in Canadian Dollars, unlike RGE, which does business in U.S. Dollars.  The practice of purchasing foreign currency hedging contracts to protect against currency fluctuations is a standard practice in international contracting.  Dkt. 1, ¶ 15.  Consistent with this standard practice and its corporate risk management guidelines, Andritz began the process of purchasing foreign currency hedging contracts beginning in February 2008, in connection with the Agreement, to minimize or eliminate foreign exchange risk. *Id.*, ¶ 16; Dkt. 1-3, p. 4; Dkt. 1-7, p. 3.  These hedging contracts related to the net balance of incoming and outgoing payments in U.S. Dollars and outgoing payments in Euros against Andritz's balance currency of Canadian Dollars.  Dkt. 1-3, pp. 4-5.

**D.     RGE's suspension of the Project for its convenience and Andritz's notification that the currency hedging contracts were being rolled over with continued charges and additional cost in the event of termination**

On October 24, 2008, RGE submitted written notification to Andritz that suspended the Project in accordance with Section 18 of the Agreement.  Dkt. 1, ¶ 19 & Dkt. 1-2.  In the suspension notice, RGE advised that it "desires to complete the detailed

design <u>only</u> of the new unit and related structures and systems" and would be in contact

soon to discuss this matter in detail.  Dkt. 1-2.  Andritz immediately ceased all activities, as

well as any activities of all Andritz subcontracts and material suppliers related to the

manufacture and supply of the Generation Unit for the Project.  Dkt. 1, ¶ 21.  After that,

RGE requested that it be provided the costs incurred by Andritz from the beginning of the

Agreement up to October 24, 2008, but not including Andritz's costs associated with the

foreign currency hedging contracts.  Dkt. 1, ¶ 22.  This request demonstrated that RGE

knew and acknowledged Andritz had foreign currency hedging contracts in place in

connection with Andritz's financing obligations under the Agreement.  Dkt. 1, ¶ 23.  By

letter dated February 13, 2009, Andritz quantified its costs as requested by RGE up to that

point as $1,342,315.00, but highlighted that the costs associated with the foreign currency

hedging contracts were not included.  Dkt. 1, ¶ 24.  In this letter, Andritz specifically

notified RGE that it would continue incurring hedging costs during the period of

suspension, and furthermore, that these hedging costs would increase if the Project was

canceled.  In this regard, the letter stated:

> <u>Hedging Currency Exchange Rate Risk</u>
>
> As we had covered during our recent meetings there remains the related
> subject of hedging contracts.  The equipment supply contract with RG&E
> requires a firm price in US dollars.  Under Andritz Hydro's Risk Management
> Guidelines, it is mandatory that exchange rate risk arising from business
> operations must be fully hedged by purchasing hedge contracts from financial
> institutions.  Whenever the underlying transactions or cash flows do not
> materialize as planned, as is the case if a project is cancelled, the foreign
> exchange rate risk exposure arising from a risk hedging transaction must be
> closed.
>
> In February 2008, Hedging contracts were purchased for the Rochester
> project.  These contracts related to the net balance of incoming and outgoing
> payments in USD and outgoing payments in Euros against our balance sheet
> currency (CDN).

* * *

While the Rochester project is in suspension status, Andritz Hydro's current positon regarding these contracts, is to rollover the contracts to future dates as they become due.  There is a relatively minor transaction cost associated with this, calculated on the difference between the lending rates of the two currencies involved.

If the project was to move from suspension status to cancellation, the current real cost to Andritz Hydro is approximately $450-500,000 USD.  This is an approximate cost based on market rates of Feb. 5/09 and will fluctuate until the date actual instructions are given to cancel the contracts.

* * *

Until we are given specific cancellation costs we will maintain the hedge contracts just as we maintain any materials specifically in hand for the project.  When you determine cancellation is necessary we will advise you of the actual exposure.  Until then we hope that you will get the approvals to continue in July, 2009 and the FX exchange costs remain only as minor transaction fees.

Dkt. 1, ¶ 25.  On March 10, 2009, Andritz submitted supplemental information regarding the materials on hand related to the Project and the costs it incurred before October 24, 2008.  Dkt. 1, ¶ 26.   This letter again highlighted that the $1,342,315 incurred by Andritz to that point did not include "costs associated with [the] foreign currency hedging contracts." *Id.*

RGE later advised Andritz during discussions occurring on December 6, 2011, that it was not able to lift the suspension, but intended to proceed with the Generation Unit manufacturing sometime in 2014.  Dkt. 1, ¶ 28.  By letter dated April 23, 2012, Andritz further warned RGE about the foreign currency hedging costs being incurred during the suspension period, and proposed how the equipment costs and foreign currency hedging costs would be treated at the time the suspension was lifted.  In this regard, Andritz even gave RGE the option to mitigate future termination costs resulting from the foreign currency hedging contracts, stating "Should RG&E elect to have ANDRITZ HYDRO

immediately cancel the hedging contracts, the current real cost to ANDRITZ HYDRO is approximately $30,000."  Dkt. 1, ¶ 30.  RGE did not elect this option to mitigate the hedging contract costs.  Over the next many years, the Project remained suspended without any official position to either lift the suspension or terminate the Agreement.  Dkt. 1, ¶ 31. During this time, Andritz rolled over and maintained the currency hedging contracts just as they maintained any materials specifically on hand for the Project.  Dkt. 1-3, p. 5.  At no time during this lengthy suspension did RGE dispute or reject liability for the hedging contract costs, despite the repeated reminders in Andritz's correspondence about the same.

In February of 2018, RGE contacted Andritz to inform Andritz that the Project was going to be moving ahead.  Dkt. 1, ¶ 32.  Also in February of 2018, at Andritz's request, RGE provided an estimated construction schedule for the Project, which projected installation of the Andritz equipment during a "Phase 2" scheduled for April 2023 – December 2025.  Dkt. 1, ¶ 33.  In April of 2018, RGE asked for Andritz's assistance in restarting the Project.  Dkt. 1, ¶ 34.  Given the continued suspension status of the Project and repeated indications by RGE of imminent suspension lift, Andritz continued to keep the Project active and rolled-over its contractual obligations including, but not limited to, the foreign currency hedging contracts, from year to year.  Dkt. 1, ¶ 35.

E.     **RGE's termination for convenience and currency hedging costs**

During a telephone conversation on September 3, 2019, RGE notified Andritz that the suspension order would not likely be lifted, despite various discussions to the contrary.  Dkt. 1, ¶ 39.  By letter dated November 4, 2019, Andritz formally requested that it be provided "an official position from [RGE] to either terminate the Contract or promptly lift the said suspension order."  Andritz further advised that "[i]n the event of

silence or refusal on the part of [RGE] to provide such official position within such prescribed time, Andritz will deem the Contract terminated pursuant to Section 18." Dkt. 1, ¶ 40.  After the Project had been suspended for more than twelve (12) years and having received no response to Andritz's letter of November 4, 2019, and having made subsequent attempts to contact RGE to discuss this matter to no avail, Andritz advised RGE by letter dated March 20, 2020, that, for all the reasons set forth in the letter, it considered the Agreement terminated for convenience by RGE in accordance with Section 18 of the Agreement.  Andritz further advised that it was winding down the Project and requested that RGE reimburse it "the amount of 1,126,970.48 CAD as final termination costs, which include[d] the costs incurred as a result of the Foreign Exchange fluctuations allocated to the Contract."  *Id.*, ¶¶ 41-42; Dkt. 1-7.

Before termination of the Project, RGE never objected to the foreign currency hedging costs and was fully aware that Andritz was incurring these costs and that Andritz expected to be compensated for them.  Dkt. 1, ¶ 36.  RGE elected to continue the suspension of the Project and never took the position that it would not pay these foreign currency hedging costs.  To the contrary, RGE acquiesced or by silence and conduct clearly and unambiguously promised to pay these foreign currency hedging costs.  Dkt. 1, ¶ 37. RGE had numerous opportunities to reduce and/or terminate its foreign currency hedging costs by either terminating the Agreement or advising Andritz to terminate its foreign currency hedging contracts.  Dkt. 1, ¶ 38.

RGE, in a letter from its General Counsel, dated April 16, 2020, acknowledged to Andritz that it terminated the Agreement for convenience pursuant to Section 18 of the Agreement.  Dkt. 1, ¶ 43.  In the same letter, RGE also acknowledged that

Section 18 of the Agreement applied in the event of a suspension or termination for convenience.  Dkt. 1, ¶ 44.  Despite RGE's confirmation of the termination for convenience of the Agreement, RGE denied that it owed any further payment obligation under Section 18 of the Agreement for the costs of the foreign currency hedging contracts.  Dkt. 1, ¶ 46. RGE claimed that these costs were not a payment obligation under Section 18.  Dkt. 1, ¶ 47. RGE also claimed Andritz's claim for such costs ignored the Limitation of Liability provision at Section 41 of the Agreement, which disclaims "incidental, special, indirect, punitive or consequential damages of any kind . . ."  Dkt. 1, ¶ 48.  As explained by Andritz's March 20, 2020 letter, the hedging costs were actual, hard-dollar costs incurred by Andritz as a result of RGE's prolonged suspension and eventual termination of the Agreement.  Dkt. 1, ¶ 49.

## F.     Andritz's Complaint and RGE's Motion to Dismiss

Andritz's Complaint asserts five claims against RGE for breach of contract, declaratory judgment (withdrawn), implied-in-fact contract, unjust enrichment, and promissory estoppel.  Dkt. 1.  RGE moved to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6).  Dkt. 9.  With respect to the first claim for breach of contract, RGE alleges that Andritz fails to state a claim because the Agreement does not create the right that Andritz seeks to enforce.  With respect to the remaining quasi-contract claims, RGE alleges that these claims are barred as being duplicative to the breach of contract claim.  RGE also alleges that Andritz's claims are barred by the Agreement's Limitation of Liability clause.

## LEGAL STANDARD

On a pre-answer motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept as true the factual allegations pled in the Complaint and draw all inferences in

Plaintiff's favor.  *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009); *Allaire Corp. v. Okumus,* 433 F.3d 248, 249-250 (2d Cir. 2006).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal,* 556 U.S. at 678; *see Allaire,* 433 F.3d at 249-250.  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal,* 556 U.S. at 679.  "A Court should not grant a motion to dismiss unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief.  *CompuDyne Corp. v. Shane,* 453 F. Supp. 2d 807, 817 (S.D.N.Y. 2006).

Where breach of contract is at issue, "[a] motion to dismiss can be granted only where the language of a contract is clear and unambiguous."  *Readick v. Avis Budget Grp., Ins.,* No. 12 Civ. 3988(PGG), 2013 WL 3388225, at *4 (S.D.N.Y July 3, 2013).  This is because "[t]he Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities."  *Bank of New York Tr., N.A. v. Franklin Advisors, Inc.,* 522 F. Supp. 2d. 632, 637 (S.D.N.Y. 2007); *see also Bell v. Leakas,* No. 90 Civ. 7981 (LMM), 1993 WL 77320, at *7 (S.D.N.Y. March 13, 1993) (ruling that, where "there are at least two rational interpretations of the [contract] . . . the meaning ascribed to the text by [the plaintiff] will be taken as true for purposes of [a motion to dismiss]").

# ARGUMENT

## POINT I

### ANDRITZ HAS STATED A CLAIM FOR BREACH OF CONTRACT

To establish breach of contract, a plaintiff must show "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011); *W.B. David & Co., Inc. v. DWA Commc'ns, Inc.,* No. 02 Civ. 8479 (BSJ), 2004 WL 369147, *2-3 (S.D.N.Y. Feb. 26, 2004) (denying motion to dismiss as contract's existence was properly alleged).  In this case, the parties do not dispute that the Agreement is valid and binding or what writing constitutes the contract between the parties.[2]  RGE does not dispute adequate performance by Andritz or that Andritz suffered damages.  Instead, RGE contests only the "breach" element, which was properly pleaded as discussed below.

**A.     Andritz has adequately alleged breach of the Agreement.**

A complaint that identifies the portion of the agreement that was breached by the defendant satisfies the "breach" element.  *See W.B. David & Co., Inc.,* 2004 WL 369147, at *3; *DiFolco v. MSNBC Cable LLC,* 622 F.3d 104, 111 (2d Cir. 2010) (vacating the dismissal of the breach of contract claim where the complaint on its face clearly alleges a breach of contract).  Here, the Complaint clearly alleges that RGE materially breached Section 18 of the Agreement by failing to pay Andritz's foreign currency hedging costs in the amount of

---

[2] The Agreement plainly states that Schedules A-E are "Contract Documents" that are incorporated by reference and form an integral part of the Agreement.  Dkt. 1-1, § 2.  Schedules B, C and D were not physically attached to the Agreement.  Andritz made no tactical decision to omit these unattached Schedules.  It is well settled that a complaint should be plain and concise because the principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted to enable him to answer and prepare for trial. *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).  This was Andritz's intention.  Thus, the Court should decline to make presumptions or draw any adverse inference as RGE requests in the Motion. Dkt. 9-1, p. 16, n. 3.

1,126,970.48 CAD.  Dkt. 1, at ¶¶ 39-61.  Thus, the Complaint properly alleges facts that satisfy the "breach" element.

**B.      RGE's arguments improperly attempt to treat this Motion as a bench trial.**

          Faced with Andritz's well-pleaded claim alleging breach of the Agreement, RGE improperly attempts to claim that Andritz terminated the Agreement and raises baseless factual disagreements concerning the proper interpretation of the Agreement. Andritz rejects RGE's claims of ambiguity in the Agreement.  However, such arguments and positions by RGE are not properly before the Court at this time, as the "Court's role in deciding a . . . motion to dismiss a breach of contract claim is not to resolve ambiguities in the contract language." *Goldin-Feldman Co. v. Blum & Fink, Inc.,* No. 99 Civ. 11637 (VM), 2000 WL 1182798, at *3 (S.D.N.Y. Aug. 18, 2000); *Bell,* 1993 WL 77320 at *7 (denying motion to dismiss contract claim where "the meaning ascribed to the text by Plaintiffs will be taken as true for purposes of 12(b)(6) motion).  To the extent they may even be considered, RGE's arguments are factually based ones, to be resolved by the factfinder after discovery has been concluded.

**1.      RGE terminated the Agreement in accordance with Section 18.**

          Incredibly, RGE argues in the Motion that Andritz, not RGE, terminated the Agreement for convenience under Section 18.  Dkt. 9-1, p. 15.  This argument fails for at least three reasons.

          First, RGE has already acknowledged that it terminated the Agreement for its convenience.  To understand this, a discussion of the parties' correspondence is necessary. RGE notified Andritz in September 2019 that the suspension order dated October 24, 2009 would not likely be lifted.  In other words, RGE was abandoning the Project.  This came as

a surprise, considering that in February 2018, RGE previously informed Andritz that the Project was moving ahead.  Dkt. 1, ¶¶ 32-34.  In response, Andritz, by letter dated November 4, 2019, requested an official position from RGE to either lift the suspension or terminate the Agreement for convenience.  In this letter, Andritz stated "In the event of silence or refusal on the part of [RGE] to provide such official position within such prescribed time, Andritz will deem the [Agreement] terminated pursuant to Section 18 upon expiration of the said prescribed time."  Dkt. 1-6.  RGE did not respond to this letter. Andritz also attempted to contact persons within RGE numerous times to discuss the matter, to no avail.  Dkt. 1-7, p. 2.  By letter dated March 20, 2020, Andritz advised RGE of the same and stated that "Andritz considers the [Agreement] to have been terminated for convenience in accordance with the terms of the Contract."  *Id.*  In response to Andritz's letters of November 4, 2019 and March 20, 2020, by letter dated April 16, 2020, RGE, through its General Counsel, acknowledged that the Agreement was terminated for convenience, relying on Section 18 as the controlling section.  Dkt. 1-8, n.2.  Under Section 18, only RGE could terminate the Agreement for convenience.  Although RGE acknowledges this fact repeatedly in its Motion, it now attempts to shirk its contractual responsibilities by falsely attributing its termination for convenience to Andritz.

Second, it is well settled that "silence" under circumstances where one would be expected to object can be deemed acceptance.  *See, e.g., Hellenic Lines v. Gulf Oil Corp.*, 340 F.2d 398, 401 (2d Cir. 1965) (party's "fail[ure] to respond . . . under circumstances which reasonably called for a reply, could be found to constitute an admission [acceptance of other party's contractual proposal] by silence"); *John William Costello Assocs. v. Standard Metals Corp.*, 99 A.D.2d 227, 327, 327-28 (1st Dep't 1984) ("[a]n offer may be accepted by

- 15 -

conduct or acquiescence"); *Westchester Resco Co. v. New England Reins.*, 648 F.Supp. 842, 846 (S.D.N.Y. 1986) (failure to object may constitute acceptance of an offer; "[u]nder New York law, an offer may be accepted by conduct or acquiescence") (citation omitted), *aff'd*, 818 F.2d 2 (2d Cir. 1987).

Here, with the Agreement having been suspended for over ten years, and time being of the essence, RGE had an obligation to further communicate after advising that it was not likely to lift the suspension.  Further response was required by RGE because abandonment and resulting termination of a project was not permitted under the prior suspension notice of October 2008.  *See Baker v. State of New York,* 77 A.D. 528 (3rd Dep't 1902) (abandonment of a project and resulting termination for convenience of the contract are not permitted under a suspension for convenience clause).  In addition, Andritz's letter of November 4, 2019 specifically requested a response from RGE and stated unequivocally that silence/non-response would result in a deemed termination for convenience of the Agreement by RGE.  Applying these principles, RGE's silence or failure to object to Andritz's letter of November 4, 2019, terminated the Agreement for RGE's convenience under Section 18.

Third, the Complaint alleges that RGE terminated the Agreement.  In deciding this Motion, the Court should treat these allegations in the Complaint as true and draw all inferences in this regard in Andritz's favor.  Dkt. 1, ¶¶ 41 and 43.  Finally, while Andritz believes the facts are clear in this respect, at a minimum, issues of fact may exist as to whether RGE terminated the Agreement for convenience.  *See e.g. Boston Concessions Grp., Inc. v. Criterion Ctr. Corp.,* 250 A.D.2d 435, 436 (1st Dep't 1998) ("Concerning the breach of contract cause of action, numerous issues of fact exist, including . . . whether defendant

terminated the agreement . . . and the validity of defendant's termination."); *Corallo v. Merrick Cent. Carburetor, Inc.,* 733 F.2d 248, 252 (2d Cir. 1984) ("[T]he issue of contract termination and arbitrability simply does not lend itself to summary disposition.").  As such, dismissal pursuant to Rule 12(b)(6) would not be appropriate.

### 2.   Andritz is entitled to receive from RGE the termination costs related to the foreign currency contracts.

In New York, "termination for convenience" clauses are valid and enforceable.  S. Biser, R. Rubin & C. Brown, *New York Construction Law Manual*, *Contractual right of termination - For convenience*, § 4.4 (2d ed. June 2020); *see also Watermelons Plus, Inc. v. New York City Dept. of Educ.,* 76 A.D.3d 973, 974 (2d Dep't 2010).  The express language in a termination for convenience provision governs the extent to which damages are awarded after a convenience termination.  *See e.g. Arc Elec. Constr. Co. v. George A. Fuller Co., Inc.,* 24 N.Y.2d 99 (1969).  A convenience termination provision often entitles the contractor to full reimbursement of its costs actually incurred plus a measure of profit and overhead.  *See New York Construction Law Manual*, *Contractual right of termination - For convenience*, § 4.4 (2d ed. June 2020).  Essentially, a convenience termination converts a fixed-price contract into a method of cost reimbursement.  *See Arc Elec. Constr. Co.,* 24 N.Y.2d at 103; *District of Columbia v. Org. for Env't Growth, Inc.,* 700 A.2d 185 (D.C. App. 1997) (holding that a contractor's recovery after a termination for convenience is calculated on the basis of actual costs incurred plus a reasonable profit, and recognizing that a convenience termination converts a fixed-price contract into a cost-reimbursable).

Here, as conceded by RGE in the Motion, Section 18 provides for the recovery of two categories of costs upon a convenience termination.  Dkt. 9, p. 17.  The first category of recovery covers the scenario where the order is suspended or terminated in

whole or part.  In that event, Andritz is entitled to recover "all costs incurred prior to such termination reasonably allocable to this order." Dkt. 1-1, § 18.  The second category is for "all costs reasonably incurred by [Andritz] as a result of the termination (such as cancellation fees of suppliers or wrap-up costs)." *Id.*

> ### a.  The foreign currency contracts were incurred prior to termination and reasonably allocable to the order.

Section 18 states that "[RGE] *may suspend or terminate* this order in whole or in part for its own convenience . . . *In such event*  [RGE] shall make payment to [Andritz] *for all costs incurred prior to such termination* reasonably allocable to this order."  Dkt. 1-1, § 18 (emphasis added).  Thus, Section 18 of the Agreement explicitly obligates RGE to pay all costs arising from the suspension or termination that were incurred prior to the termination. There is nothing in Section 18 to suggest that for items purchased and utilized in connection with the performance of the Agreement prior to termination, RGE would not reimburse Andritz for the related closeout costs that were actually paid shortly after the termination. By using the phrase "all costs," the parties explicitly provided the broad right of recovery for items related to the order in the event of termination or suspension, without restriction.  To disallow the foreign currency hedging costs would be to disregard the plain terms of Section 18 of the Agreement.  RGE argues a tortured interpretation of Section 18 in several ways.

First, RGE erroneously claims that the suspension is not relevant because Section 18 permits Andritz to recover costs *only* after termination by RGE, not suspension. Dkt. 9-1, p. 16.  This argument must fail as a matter of law because it ignores the plain language of Section 18.  *See Slatt v. Slatt,* 64 N.Y.2d 966, 967 (1985) (it is black letter law that, when dealing with issues of contract interpretation, courts must construe an agreement according to the parties' intent, and the best evidence of what parties to a written agreement

- 18 -

intended is what was said in the writing).  Here, the use of the phrase "In such event," in the second sentence of Section 18 implies that costs related to both the termination and suspension, as referenced in the first sentence of Section 18, are both recoverable in the event of termination.  Indeed, RGE even conceded exactly the same through its General Counsel in his letter of April 16, 2020, stating: "The February 2008 Agreement is clear about the category of damages available to 'Seller' (as defined therein) in the event of a suspension or alleged termination for convenience."  Dkt. 1-8, p. 3.  The word "cost" is commonly defined to mean "the amount or equivalent paid or charged for something."  *See* https://www.merriam-webster.com/dictionary/costs.

Second, RGE, in a strained interpretation that harshly puts form over substance, claims that hedging costs are not recoverable because the foreign currency contracts purchased for the Project by Andritz were closed out shortly *after* RGE's termination of the Agreement.  Dkt. 9-1, p. 17.  This argument is simply without merit and blatantly ignores that the cancellation date/calculation of the foreign exchange profit/loss was January 10, 2020.  Dkt. 1-7, p. 3.  Thus, the cancellation date for the hedging contracts was before RGE's convenience termination.  Furthermore, the fact that a termination-related cost is liquidated and fully quantified after the date of a termination does not mean the cost was not incurred prior to termination or is somehow not recoverable.  Accepting RGE's interpretation requires the Court to improperly read Section 18 in a vacuum, not as a whole, and disregards the rule of law.

Where there is a convenience termination, the costs for items used in the performance of the Agreement are recoverable irrespective of the cost actually being incurred post-termination.  *See Nolan Bros., Inc. v. United States,* 437 F.2d 1371 (Ct. Cl.

1971).[3]  In *Nolan Bros., Inc.*, for instance, the court held that plaintiff was entitled to recover the price of new tires "irrespective of whether the actual replacement of such tires occurred during the pre-termination period or after the work under the contract was terminated." There, the convenience termination provision at issue provided that the plaintiff was entitled to be reimbursed for the total cost of all contract work performed *prior to the termination*.  *Id.* at 1382.  What was determinative to the Court awarding these post-termination costs was that the tires were used during the performance of the contract.  Because of this, the Court determined that the temporal limitation of the cost being incurred prior to termination was satisfied, and the actual post-termination tire replacement costs were recoverable.  *Id.*; *see also White Buffalo Constr., Inc. v. United States,* 52 Fed.Cl. 1, 11 (Ct. Cl. 2002) (holding that the United States must pay the contractor fair compensation for any additional equipment repairs occurring after termination where this equipment was used during the performance of the contract); *Brand Inv. Co. v. United States*, 58 F.Supp. 749, 751 (Ct. Cl. 1944), *cert. denied*, 324 U.S. 850 (1945) (recognizing that payment of post-suspension standby was proper where "valuable equipment ... suddenly became idle and useless, at least for a temporary period").

Here, there is no dispute that each of the foreign currency hedging contracts were purchased during the term of the Agreement, used during the term of the Agreement, and were allocable to the Project.  Dkt. 1-7, p. 3; Dkt. 1-3, p. 4; Dkt. 1-5, p. 4.  Notably, as discussed above, while the convenience termination was confirmed in March 2020, the date

---

[3] Because there is little state common law interpreting termination for convenience provisions, most state courts, when reviewing private contracts, look at federal procurement law.  Philip L. Bruner and Patrick J. O'Connor, Jr., 2 Bruner and O'Connor on Construction Law § 5.268 § 14.4.1— Owner's right to terminate for convenience (risk allocation) (August 2020 Update).

of cancellation/calculation of foreign exchange loss was January 1, 2020.  Dkt. 1-5, p. 4.

When applying the foregoing principles, it is of no importance that the closeout of these

hedging contracts occurred after the termination.  Rather, like in *Nolan Bros., Inc.* and *White*

*Buffalo Constr., Inc.,* what is dispositive is that these contracts were in place and used during

the term of the Agreement.  For this reason, the costs to terminate the currency hedging

contacts in the amount of 1,126,970.48 CAD is recoverable under Section 18 of the

Agreement.

> **b.    The termination costs for the foreign currency contracts were
> reasonably incurred by Andritz as a result of the termination.**

Section 18 also states that upon a convenience termination, Andritz is entitled

to receive "all costs reasonably incurred by [Andritz] as a result of the termination."

Dkt. 1-1, § 18.  Thus, this part of Section 18 is a separate and independent basis that also

explicitly obligates RGE to pay the termination costs for the foreign currency hedging

contracts.

Faced with this, RGE speciously argues in the Motion that because

Paragraph 3.4 of the Boilerplate Terms submitted with the Proposal allegedly speaks to price

modification in the circumstance of currency fluctuations, recovery of the currency hedging

losses are not contemplated by Section 18.  This is simply untrue.  Again, giving any merit

to RGE's interpretation would be disregarding the plain language of the Section 18 and

established New York law.  The payment or adjustment obligations set forth in Paragraph

3.4 only concern the situation where there is performance of the Agreement and no

convenience termination. Dkt. 9-3, p. 43.  In contrast, Section 18 of the Agreement strictly

governs the scenario where the Agreement is terminated for convenience.  Simply put,

Paragraph 3.4 governs payment principles before termination, and Section 18 of the Agreement governs payment principles after a convenience termination.

These fundamental payment and damages principles have been adopted and applied by many courts, including New York's highest Court in *Arc Elec. Constr. Co. v. George A. Fuller Co., Inc.,* 24 N.Y.2d 99 (1969).  In that case, a contractor terminated a subcontract for convenience.  The convenience termination provision at issue required the contractor to pay "the entire amount due."  However, after the termination, the contractor refused to pay the subcontractor for the actual costs incurred because it argued that the architect failed to approve the subcontractor's work.  The contractor argued that without the architect's approval, the subcontractor was not due its actual costs.  The Court of Appeals rejected this argument and pointed out the difference in the payment obligations on the contractor before and after a termination for convenience:

> [t]here is considerable difference between the rejection of a claim for a progress payment and the refusal of payment after the contract has been terminated and all work has ceased . . . The withholding of approval, though it may have postponed, did not eliminate Arc's right to compensation for the work it had performed.  However, once the contract was terminated, preventing the subcontractor from curing any defects, it is reasonable to construe the contract as providing for payment for all work actually performed, even though it may not have been entirely completed.  If there were any deficiencies in performance, they would merely diminish the amount to which Arc would be entitled and would not (and should not) result in the forfeiture of its entire right to be compensated.  Such a construction of the contract, which adequately protects the interests of both parties, comports best with its language . . . .

*Arc Elec. Constr. Co.,* 24 N.Y.2d at 103-104.  The Court then went on to explain the rationale for allowing Arc to recover its actual costs for all work performed:

> [i]ndeed, even if a requirement for the architect's approval was expressly incorporated [into the contract], it would not be enforceable.  It was Fuller's own act, in terminating the contract, which rendered it impossible for Arc to take any necessary steps to satisfy the architect.  The law looks with disfavor

on contractual provisions that would allow one party, by its own unilateral act, to avoid its obligations by preventing or hindering the other party from fulfilling one of the conditions to the contract. "[T]he defendant cannot rely on [a] condition precedent . . . where the non-performance of the condition was caused or consented to by itself.

*Id.*

As *Arc Electrical* demonstrates, a convenience termination will not be interpreted as a forfeiture on the non-terminating party. It is the cardinal principle of the termination for convenience clause that the contractor receives full reimbursement of its actual costs because any non-performance of the contract as a direct result of actions taken by the terminating party. *See id.* Such a result is consistent with well-settled law that a party to a contract cannot rely on the failure of the other party to perform when he has frustrated or prevented the performance. *See e.g. Water St. Dev. Corp. v. City of New York,* 220 A.D.2d 289, 290-91 (1st Dep't 1995).

RGE even acknowledges the parties' prior course of dealings by stating that Paragraph 3.4 of the Boilerplate Terms would apply *in the event* that RGE lifted the suspension. Dkt. 9-1, pp. 21-22. This section would apply if there were no convenience termination. Interpreting Paragraph 3.4 of the Boilerplate Terms as RGE proposes in the Motion is also impermissible because doing so would disregard the fair and reasonable meaning of the language in the Agreement. *See Wenig v. Glens Falls Indem. Co.,* 294 N.Y. 195, 203 (1945) (words and acts should be given effect in accordance with meaning that they would convey to a reasonable person).

RGE also erroneously claims in the Motion that permitting Andritz to recover currency hedging losses would be inequitable and amount to an unreasonable economic advantage. Dkt. 9-1, p. 21. RGE is wrong because "[t]he thrust of the termination for

convenience clause is to convert the contractor's compensatory damage interest from 'expectancy' to 'reliance' damages."[4]  *See* Philip L. Bruner and Patrick J. O'Connor, Bruner and O'Connor on Construction Law, § 18:45 - Contract termination for convenience.  As discussed above, these hedging costs are actual, hard-dollar costs incurred by Andritz as a result of RGE's prolonged suspension and eventual termination of the Agreement.  Dkt. 1, ¶ 49.  Recovery of these costs would not constitute a windfall in any way to Andritz, but rather restitution.  Thus, awarding such costs would be equitable and in accordance with the express terms of Section 18 of the Agreement. Dkt. 1, ¶ 50.

> **c.    Under the "inconsistency" provision, the Agreement takes precedence over any conflicting terms.**

Under New York state law, the order of precedence as stated in the "inconsistency" provision at Section 2 of the Agreement is enforceable.  *See Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc.,* 112 A.D.3d 78, 83 (1st Dep't 2013).  Trumping language such as an "inconsistency" provision controls over all other contrary language.  *See id.* Additionally, where two documents are to be interpreted, one specifically prepared for the transaction in question and the other a general form, the former takes precedence as to all provisions that conflict in the two documents. *Oakgrove Constr., Inc. v. Genesee Valley Nurseries, Inc.,* 39 A.D.3d 1283, 1284 (4th Dep't 2007).

As acknowledged in the Motion, the agreed-upon fixed Contract Price set forth in the Purchase Order was $5,263,020.00.  Dkt. 9-1, p. 9.  The Agreement plainly provides that "the prices stated on the face of the Purchase Order shall be considered firm."

---

[4] The Restatement (Second), Contracts § 344(b) (1981) defines the reliance interest as the "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made."

Dkt. 1-1, § 9.  In contrast, Paragraph 3.4 of the Boilerplate Terms is contained within a

General Terms and Conditions generic form that is not specific to the transaction, stating:

> The Contract Price shall be payable in Canadian dollars and is further subject
> to modification to the extent of any change of foreign exchange rates (if so
> specified in our offer) if the Release for Manufacture is delayed beyond that
> quoted.

Dkt. 9-3, p. 43.  This paragraph is plainly in conflict with the Agreement, inasmuch as the

Contract Price was in U.S. dollars and firm. Dkt. 1-1, § 9. Thus, the Agreement's

"inconsistency" provision renders Paragraph 3.4 inoperative.

> ### d.    In the alternative, assuming *arguendo* that the Court does not adopt Andritz's contract construction, Section 18 is ambiguous and issues of fact exist.

A contract is ambiguous if the term relied upon is susceptible to more than one

reasonable meaning.  *See Reiss v. Fin. Performance Corp.,* 97 N.Y.2d 195, 199 (2001).  As

discussed above, at this stage of the proceedings, the Court's role is not to resolve contract

ambiguities.  Assuming *arguendo* that the Court does not adopt Andritz's construction of

Section 18 as a matter of law, Section 18 is ambiguous and issues of fact exist. As such, the

Motion to Dismiss must be denied in favor of fact discovery.

## POINT II

## THE LIMITATION OF LIABILITY CLAUSE IS INAPPLICABLE TO THIS ACTION AND DOES NOT BAR RECOVERY

Section 41 of the Agreement states in pertinent part that ". . . in no event shall

either party be liable to the other or any of its affiliates related in any way to this Agreement

or performance thereof for any incidental, special, indirect, punitive or consequential

damages of any kind . . ."  Dkt. 1-1, § 41.  RGE claims in the Motion that this clause is a bar

to recovery of Andritz's hedging losses. Dkt. 9-1, p. 24.  RGE is wrong for at least three reasons.

First as discussed above, Andritz's hedging losses are specifically recoverable under Section 18 of the Agreement.  Second, this Limitation of Liability clause has no application to this dispute because RGE terminated the Agreement for convenience. Applying the Limitation of Liability clause as RGE suggests results in an impermissible forfeiture.  *See Arc Elec. Constr. Co.,* 24 N.Y.2d at 103 (where there is a convenience termination, the contract must be construed as providing for payment of all costs).  Third, the foreign currency hedging losses are direct damages not barred by the Limitation of Liability clause.  Direct damages arise as "the natural and probable consequence of the breach." *Am. List Corp. v. U.S. News & World Report,* 75 N.Y.2d 38, 43 (1989); *Powers v. Stanley Black & Decker, Inc.,* 137 F.Supp. 3d 358 (S.D.N.Y. 2015). Direct damages are typically expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract. *See Latham Land I, LLC v. TGI Friday's Inc.,* 96 A.D.3d 1327, 1331 (3d Dep't 2012).  By contrast, consequential damages "do not so directly flow from the breach." *Am. List Corp.,* 75 N.Y.2d 38 at 43.  Here, the hedging costs are nothing more than financing costs. Andritz's recovery of such costs puts Andritz in as good of a position as it would have been in had the Agreement not been made.

The rule of law in New York is that financing costs are contemplated by parties to a construction contract and are considered direct damages, not consequential damages. *See In re: Long Island Lighting Co. v. Assessor for Town of Brookhaven, ,* 202 A.D.2d 32, 41 (2d Dep't 1994) ("It is well settled that financing costs . . . constitute 'expenditures

that reasonably and necessarily are to be expected in the re-creation of a structure.'"). This

concept is well settled. For example, a leading construction treatise states:

> On construction projects, the owner's extended overhead, lost profits,
> additional financing costs, and loss of use are usually within the
> contemplation of contractors as they ponder the possible result of their delays.
> These types of an owner's delay damages should not be considered
> consequential.

Barry B. Bramble and Michael T. Callahan, *Construction Delay Claim*, § 12.19 Owner's

Damages (6th ed. 2020-2 Supp.). Thus, Andritz's financing costs, in the form of hedging

contracts, are direct and not consequential damages. Finally, here, the Complaint alleges

that purchasing foreign currency hedging contracts is a standard practice in international

contracting, and RGE knew that Andritz had foreign currency hedging contracts in place in

connection with the Agreement. Dkt. 1 at ¶¶ 15, 17 and 23. The Complaint also

specifically alleges that the foreign currency hedging costs are direct damages and that the

Limitation of Liability clause is not applicable. Dkt. 1 at ¶¶ 52 & 53. The Court should

accept these allegations as true and draw all inferences in Andritz's favor. For these

reasons, the Limitation of Liability clause is not applicable.

## POINT III

### THE QUASI-CONTRACT CLAIMS ACCOUNT FOR RGE'S POST-SUSPENSION ACQUIESCENCE TO THE HEDGING COSTS AND ARE THEREFORE PROPER ALTERNATIVE CAUSES OF ACTION.

Even if the Court were to accept RGE's theory that Section 18 does not

contemplate reimbursement of hedging costs, regardless of when the Agreement was

terminated, Andritz is nevertheless entitled to maintain its alternative quasi-contract

theories of liability. Rule 8(d)(2) of the Federal Rules of Civil Procedure provides that "[a]

party may set out [two] or more statements of a claim . . . alternatively or hypothetically,

either in a single count . . . or in separate ones."  A party may also "state as many separate

claims . . . as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3); *Seiden Assocs., Inc. v.*

*ANC Holdings, Inc.*, 754 F. Supp. 37, 39-40 (S.D.N.Y. 1991) (Rule 8 of the Federal Rules of

Civil Procedure "and the pleading rules of New York State law permit the pleading of

contradictory claims alleging both breach of a contract or, in the alternative, a quasi-

contract.  Dismissal of plaintiff's alternative theories at this stage would violate the liberal

policy of Rule 8(e)(2) which allows plaintiffs wide 'latitude' in framing their right to

recover.").

Under New York law, a claim sounding in contract and one sounding in

quasi-contract are not "mutually exclusive in all events and under all circumstances."  *Joseph*

*Sternberg, Inc. v. Walber 36th St. Assocs.*, 187 A.D.2d 225, 227-28 (1st Dep't 1993).  Indeed, as

the New York Court of Appeals has recognized:

> In this State where a litigant fails to establish the right to recover upon an
> express contract he may, in the same action, recover in *quantum meruit*.  If
> warranted by the pleadings and proof, the case may be submitted to a jury on
> both theories and an election need not be made.

*Smith v. Kirkpatrick*, 305 N.Y. 66, 73 (1953), *overruled in part, on other grounds, O'Brien v. City*

*of Syracuse*, 54 N.Y.2d 353, 357-58 (1981).

If, as RGE claims, recovery of costs Andritz incurred under the foreign

currency hedging contracts is precluded under Section 18, Andritz will require the

alternative quasi-contract theories of liability to account for RGE's post-suspension assent to

liability for hedging costs.  As more fully discussed above, RGE knew as early as February

2009 that Andritz had entered into third-party currency hedging contracts in accordance

with its Risk Management Guidelines and continued to incur hedging costs during the

period of suspension.  Dkt. 1-3, p. 4; Dkt. 1-4, p. 1.  Andritz even submitted a proposal in

April 2012 for addressing the hedging costs once the suspension was lifted and offered RGE the option to mitigate future termination costs resulting from the hedging contracts.  Dkt. 1-5, pp. 2, 4.  RGE was therefore aware that Andritz was incurring hedging costs for which Andritz expected compensation .  Nevertheless, RGE failed to object to the hedging contracts or disclaim liability for costs incurred thereunder.  In reliance on RGE's failure to object, as well as its repeated indications that the suspension would be imminently lifted, Andritz kept the Project alive, rolled-over its hedging contracts year after year, and incurred additional costs thereunder.  Dkt. 1, at ¶¶ 35-38.

        At this stage of the case, there is no basis to conclude that Andritz's quasi-contract claims should be dismissed, particularly when RGE has not yet filed an answer.  *See Nat'l City Com. Cap. Co., LLC v. Glob. Golf, Inc.*, No. 09-CV-0307(JFB)(AKT), 2009 WL 1437620, at *1 (E.D.N.Y. May 20, 2009).  Moreover, there is no basis to conclude that the quasi-contract claims must fail as a matter of law.  Indeed, over the course of 12 years, RGE continually insisted that the suspension would be imminently lifted, while simultaneously failing to object to the hedging costs incurred by Andritz, despite numerous opportunities to do so.  RGE's actions are prima facie evidence that it understood hedging costs were allocable to it, notwithstanding the language of Section 18 and/or the Boilerplate Terms.  In light of the liberal pleading standards afforded litigants, at this point in the litigation, Andritz is entitled to maintain a breach of contract claim and alternative quasi-contract claims reflecting RGE's post-suspension acquiescence to responsibility for the hedging costs.  *See e.g. Miller v. Schloss*, 218 N.Y. 400, 407 (1916) (assent to contract implied in fact may be inferred from the conduct of the party to be charged).  Accordingly, Andritz's alternative claims sounding in quasi-contract must survive the Motion to Dismiss.

## CONCLUSION

Based on the foregoing, the Complaint should not be dismissed and RGE's

Motion should be denied.


Dated:  February 5, 2021                    PHILLIPS LYTLE LLP
        Rochester, New York


                                            By:  /s/ Chad W. Flansburg
                                                 Chad W. Flansburg
                                                 Tara Ward
                                            Attorneys for Plaintiff
                                            *Andritz Hydro Canada Inc.*
                                            28 East Main Street
                                            Suite 1400
                                            Rochester, NY  14614-1935
                                            Telephone No. (585) 238-2000
                                            cflansburg@phillipslytle.com


Doc #3542503