UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ANDRITZ HYDRO CANADA INC., the successor to
VA TECH HYDRO CANADA, INC.,

           Plaintiff,

        v.

ROCHESTER GAS & ELECTRIC CORPORATION,

          Defendant.

**NOTICE OF APPEAL**

Civil Action No.:
20-CV-6772-FPG

---

      Notice is hereby given that Plaintiff Andritz Hydro Canada, Inc., the

successor to VA Tech Hydro Canada, Inc. ("Plaintiff"), hereby appeals to the United States

Court of Appeals for the Second Circuit from each and every part of the Judgment entered

on January 4, 2023 (CM/ECF # 31), that dismissed Plaintiff's breach of contract claims

pursuant to the Court's July 21, 2021 Decision and Order (CM/ECF # 19), which

Judgment and Decision and Order are attached.

Dated:  Rochester, New York
       January 18, 2023

PHILLIPS LYTLE LLP


By: __/s/ Chad W. Flansburg_____
      Chad W. Flansburg, Esq.
Attorneys for Plaintiff
*Andritz Hydro Canada, Inc., the successor*
*to VA Tech Hydro Canada, Inc.*
28 E. Main Street, Suite 1400
Rochester, New York 14614
585-238-2000
cflansburg@phillipslytle.com

TO:    Joseph G. Curran
          Joshua M. Agins
          Attorneys for Defendant
          *Rochester Gas and Electric Corporation*
          1800 Bausch & Lomb Place
          Rochester, New York 14604
          jcurran@wardgreenberg.com
          jagins@wardgreenberg.com

Doc #4651968

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Western    District of    NY

| | |
|---|---|
| Andritz Hydro Canada, Inc., the successor to VA Tech Hydro Canada, Inc., *Plaintiff* v. Rochester Gas & Electric Corporation, *Defendant* | ) ) ) ) ) ) ) |

Civil Action No.    20-CV-6772-FPG

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)*
_____ recover costs from the plaintiff *(name)* _____.

☒ other:   That Plaintiff's breach of contract and declaratory judgment claims be dismissed pursuant to the court's July 21, 2021
Decision & Order (ECF No. 19), and that Plaintiff's implied-in-fact contract, unjust enrichment, and promissory estoppel claims be
dismissed with prejudice pursuant to the parties' stipulation of dismissal (ECF No. 30).

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision
was reached.

☒ decided by Judge    Frank P. Geraci, Jr. _____ on a motion for dismissal and
pursuant to the parties' stipulation of dismissal.

Date:    01/04/2023

CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Andritz Hydro Canada, Inc., *the successor
to VA Tech Hydro Canada, Inc.*,

                                Plaintiff,

                                          Case # 20-CV-6772-FPG

v.

                                          DECISION AND ORDER

Rochester Gas & Electric Corporation,

                                Defendant.

## INTRODUCTION

On September 29, 2020, Plaintiff Andritz Hydro Canada, Inc. ("Andritz") filed this action against Defendant Rochester Gas & Electric Corporation ("RG&E") asserting claims for breach of contract, declaratory judgment, implied-in-fact contract, unjust enrichment, and promissory estoppel. ECF No. 1. On December 18, 2020, RG&E filed a motion to dismiss Andritz's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 9. RG&E's motion to dismiss Andritz's complaint is GRANTED IN PART and DENIED IN PART.

## RELEVANT FACTS[1]

Andritz is a foreign corporation organized under the laws of New Brunswick, Canada with a principal place of business of Quebec, Canada. ECF No. 1 ¶ 2. RG&E is a New York corporation with a principal place of business in Rochester, New York. *Id.* ¶ 3. Andritz designs, manufactures, and supplies equipment and services to hydropower plants in Canada and the United States. *Id.* ¶ 8. RG&E provides utility service to nearly 700,000 electric and natural gas customers in Rochester, New York and the surrounding communities. *Id.* ¶ 9.

---

[1] Except where noted, the Court takes the following allegations from Andritz's complaint, ECF No. 1, and accepts them as true to evaluate RG&E's motion to dismiss.

In 2008, RG&E decided to upgrade and expand a hydroelectric power station it operates in Rochester by installing a new turbine generator. *Id.* ¶¶ 10–11. To that end, RG&E contracted with Andritz's predecessor[2] for the purchase of such a generator (the "Agreement"). *Id.* ¶ 12. The Agreement is dated February 5, 2008 and provides that:

> [RG&E] may suspend or terminate this order in whole or in part for its own convenience by giving [Andritz] twenty-four (24) hours notice. In such event [RG&E] shall make payment to [Andritz] for all costs incurred prior to such termination reasonably allocable to this order, under recognized accounting practice, together with a reasonable allowance for overhead and profit on work performed, plus all costs reasonably incurred by [Andritz] as a result of the termination (such as cancellation fees of suppliers or wrap-up costs), less disposal or retention value of termination inventory. This provision shall not be deemed to limit or otherwise affect [RG&E]'s right to terminate this Agreement for breach or default by [Andritz].

*Id.* ¶¶ 12, 18; ECF No. 1-1 § 18.

The Agreement provides that payment will be made in United States Dollars. ECF No. 1 ¶ 14. In connection with the Agreement, Andritz purchased foreign currency heading contracts to reduce or eliminate its risk that fluctuations in the value of the United States Dollar relative to the Canadian Dollar would reduce the value of the Agreement. *Id.* ¶¶ 15, 16. Andritz alleges that it is standard practice in international contracting to use foreign currency hedging contracts to protect against fluctuations in currency value. *Id.* ¶ 15.

Later that year, in October 2008, RG&E provided written notice to Andritz that the project was suspended and directed Andrtiz "to stop incurring any additional cost for th[e] project." *Id.* ¶ 19; ECF No. 1-2 at 2. RG&E requested that Andritz provide it with the costs Andritz had incurred from the beginning of the contract up to the suspension date, excluding costs associated with the

---

[2] Andritz Group acquired VA Tech Hydro Canada, Inc. ECF No. ¶¶ 12, 20. After the acquisition, on December 31, 2008, VA Tech changed its name to Andritz. *Id.* Because it has no impact on the relevant analysis, the Court simply refers to both Andritz and VA Tech as "Andritz."

foreign currency hedging contracts. ECF No. 1 ¶ 22. Andritz ceased all activities related to the manufacture and supply of the generation unit. *Id.* ¶ 21. In February 2009, Andritz sent a letter to RG&E detailing the requested costs, which totaled $1,342,315, but explained that such costs did not include any costs associated with foreign currency hedging contracts and that such costs would continue to accrue. *Id.* ¶¶ 24–25; ECF No. 1-3. Andritz explained that, if the project were to be canceled and it were to unwind the hedging contracts, "the current real cost to Andritz Hydro is approximately $450-500,000 USD." ECF No. 1 ¶ 25; ECF No. 1-3 at 5. Andritz further clarified that that figure was "an approximate cost based on market rates of Feb. 5/09 and w[ould] fluctuate until the date actual instructions [we]re given to cancel the contracts." ECF No. 1 ¶ 25; ECF No. 1-3 at 5.

In March 2009, Andritz provided RG&E with supplemental information regarding the $1,342,315 in costs incurred by Andritz prior to October 24, 2008, but again Andritz specified that the total did not include costs associated with foreign currency hedging contracts. ECF No. 1 ¶ 26. In December 2009, RG&E paid Andritz the amount requested. *Id.* ¶ 27.

In December 2011, RG&E advised that it was unable to lift the suspension but planned to proceed with the project in 2014. *Id.* ¶ 28. On April 23, 2012, Andritz sent a letter to RG&E reminding it of the foreign currency hedging costs incurred during the suspension period "and proposed how the equipment costs and foreign currency hedging costs would be treated at the time the suspension was lifted." *Id.* ¶ 29. In that letter, Andritz stated: "Should RG&E elect to have ANDRITZ HYDRO immediately cancel the hedging contracts, the current real cost to ANDRITZ HYDRO is approximately $30,000." *Id.* ¶ 30.

The project did not proceed in 2014 and remained in suspension. *Id.* ¶ 31. In February 2018, RG&E informed Andritz that the project would be moving ahead, and at Andritz's request,

RG&E provided a project schedule for the installation of the equipment for April 2023 through December 2025. *Id.* ¶¶ 32–33. In September 2019, however, RG&E notified Andritz that the suspension order would not likely be lifted. *Id.* ¶ 39. On November 4, 2019, Andritz sent a letter to RG&E requesting its "official position" on either terminating the Agreement or lifting the suspension order. *Id.* ¶ 40. Andritz stated that "[i]n the event of silence or refusal on the part of [RG&E] to provide such official position within such prescribed time, Andritz w[ould] deem the Contract terminated pursuant to Section 18." *Id.* ¶ 40; ECF No. 1-6 at 2. Having received no response despite efforts to contact RG&E, Andritz advised RG&E by letter dated March 20, 2020 that it considered the Agreement terminated by RG&E for convenience in accordance with Section 18. ECF No. 1 ¶ 41. Andritz requested $1,126,970.48 Canadian Dollars as final termination costs, which included "the costs incurred as a result of the Foreign Exchange fluctuations allocated to the" Agreement. *Id.* ¶ 42.

In response, RG&E wrote a letter to Andritz dated April 16, 2020. *Id.* ¶ 43; ECF No. 1-8. In that letter, RG&E stated that it "never issued a termination notice under the . . . Agreement" and that it understood that Andrtiz had "terminated the Agreement." ECF No. 1-8 at 4. RG&E further denied that it owed Andritz payment for costs associated with the currency hedges under the Agreement or any other additional payments. ECF No. 1-8.[3]

Because of the project's suspension, Andritz kept the project active and rolled-over its contractual obligations, including its foreign currency hedging contracts. ECF No. 1 ¶ 35. RG&E was aware Andritz was incurring costs associated with the hedging contracts and Andritz expected

---

[3] Andritz alleges that, in its letter, RG&E "acknowledged to Andritz that it terminated the Agreement for convenience pursuant to Section 18." ECF No. 1 ¶ 43. This allegation, however, is contradicted by the letter attached to Andritz's complaint. ECF No. 1-8. The Court need not accept Andritz's conclusory characterization of the letter over the text of the letter itself. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 147 (2d Cir. 2011) ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").

to be compensated, but RG&E never objected to the costs. *Id.* ¶ 36. RG&E continued the suspension of the project and never took the position that it would not pay the foreign currency hedging costs. *Id.* ¶ 37.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court must "draw all reasonable inferences in Plaintiff['s] favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## DISCUSSION

Andritz asserts claims for (1) declaratory judgment, (2) breach of the Agreement, (3) breach of an implied-in-fact contract, (4) unjust enrichment, and (5) promissory estoppel. ECF No. 1. RG&E argues that each of these claims should be dismissed. ECF No. 9-1.

### I.    Declaratory Judgment

Andritz seeks a declaratory judgment that RG&E is liable for the cost of the foreign currency hedging contracts. ECF No. 1 ¶ 66. RG&E argues that Andritz's claim for declaratory relief is duplicative of its breach of contract claim. ECF No. 9-1 at 22–23. In response, Andritz has withdrawn its claim for declaratory judgment. ECF No. 15 at 8 n.1. Accordingly, RG&E's motion

to dismiss Andritz's claim for a declaratory judgment is GRANTED. *See Leder v. Am. Traffic Sols., Inc.*, 81 F. Supp. 3d 211, 218 (E.D.N.Y. 2015).

## II.    Breach of Contract

### A.    Termination of the Contract

Under New York law,[4] a plaintiff must plead three elements to establish a claim for breach of contract: (i) the existence of a contract; (ii) performance of the contract by one party; (iii) breach of the contract by the other party; and (iv) damages resulting from the breach. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000). RG&E argues that Andritz's claim for breach of the Agreement should be dismissed on several grounds. ECF No. 9-1. As an initial matter, RG&E argues that it did not terminate the Agreement and accordingly Andritz cannot claim a breach of Section 18 of the Agreement. *Id.* at 15–17. In response, Andritz argues that RG&E terminated the Agreement, that it has adequately alleged breach of Section 18, and that RG&E is attempting to treat its motion like a bench trial in that it asks the Court to resolve ambiguities in the Agreement. ECF No. 15 at 19–23.

"It is axiomatic . . . that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Abakan, Inc. v. Uptick Cap., LLC*, 943 F. Supp. 2d 410, 414 (S.D.N.Y. 2013) (internal quotation marks and brackets omitted). To determine what "parties to a written agreement intend," courts look to "what they say in their writing." *Id.* "[T]he threshold question is whether the contract is ambiguous." *Id.* (internal quotation marks omitted). "When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). This "is

---

[4] The parties assume that New York law applies for purposes of RG&E's motion, which is "sufficient to establish the applicable choice of law." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 n.4 (2d Cir. 2001); *see also* ECF No. 1-1 at 14 (stating the "Agreement shall be governed by and construed according to the laws of the State of New York").

a question of law for the Court," *Abakan*, 943 F. Supp. 2d at 414, that may be resolved on a motion to dismiss, but "any contractual ambiguities [should be resolved] in favor of the plaintiff." *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

"It is well settled that a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin*, 639 F.3d at 69. "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Id.*; *see also Abakan*, 943 F. Supp. 2d at 414 ("A written agreement that is complete, clear and unambiguous on its face must be interpreted according to the plain meaning of its terms, without the aid of extrinsic evidence." (internal quotation marks and brackets omitted)). The Second Circuit has explained that "the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin*, 639 F.3d at 69. "[A]mbiguity does not exist simply because the parties urge different interpretations." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 616 (2d Cir. 2001) (internal quotation marks omitted).

Here, the Court finds no ambiguity in the method of termination specified by Section 18 of the Agreement. It provides: "[RG&E] may suspend or terminate this order in whole or in part for its own convenience by giving [Andritz] twenty-four (24) hours['] notice." ECF No. 1-1 § 18. The Agreement specifies that terminations pursuant to Section 18 are contingent upon RG&E giving Andritz twenty-four hours' notice. Absent such notice, a termination pursuant to Section 18 cannot occur. Accordingly, the relevant question is whether Andritz has adequately alleged that RG&E provided Andritz twenty-four hours' *notice*. Andritz has not.

7

Andritz alleges that RG&E suspended the project on October 24, 2008 via written notice and requested that Andritz "stop incurring any additional cost for this project." ECF No. 1 ¶ 19; ECF No. 1-2 at 2. Andritz complied and suspended the project and, at RG&E's request, provided RG&E with an accounting of costs "incurred by [Andritz] from the beginning of the [Agreement] up to October 24, 2008 (but not including costs associated with foreign currency hedging contracts)." ECF No. 1 ¶¶ 22–25; ECF No. 1-3 at 2. That suspension continued through November 4, 2019, at which time Andritz stated in a letter that, during "a telephone conversation of September 3, 2019, [RG&E] notified Andritz that the suspension order dated October 24, 2008 . . . would not likely be lifted." ECF No. 1-6 at 2. It accordingly requested, "within 10 days of receipt of the [letter], an official written position from [RG&E] to either terminate the [Agreement] or promptly lift the . . . suspension order." *Id.* Andritz further stated that, "[i]n the event of silence or refusal on the part of [RG&E] to provide such official position within such prescribed time, Andritz w[ould] deem the Contract terminated pursuant to Section 18 upon the expiration of the [ten days]." *Id.*

On March 20, 2020, Andritz followed up with an additional letter. Andritz stated that the project and the Agreement had "been suspended for more than 12 years" and that the "suspension period [wa]s far beyond any reasonable suspension and . . . far longer than could have reasonably been anticipated by Andritz when negotiating the [Agreement]." ECF No. 1-7 at 2. Given that and "that RG&E [wa]s still not moving forward with the [Agreement] and ha[d] not even responded in any way to [Andritz's] last letter, Andritz consider[ed] (a) that the [Agreeemnt] [wa]s abandoned; (2) that RG&E ha[d] prevented Andritz from performing, which invokes the prevention doctrine; (3) that RG&E ha[d] breached the [Agreement] provision stating that Andritz's performance would be governed by a time-is-of-the-essence provision, which RG&E

8

has ignored; and (4) that RG&E is now liable for anticipatory repudiation." *Id.* Based on the foregoing, "Andritz consider[ed] the [Agreement] to have been terminated for convenience in accordance with the terms of the [Agreement]." *Id.* Andritz accordingly requested reimbursement in the amount of $1,126,970.48 Canadian Dollars. *Id.*

The Agreement, however, plainly does not give Andritz the right to invoke a Section 18 termination. Andritz is essentially attempting to rewrite the parties' agreement to allow for a Section 18 termination via RG&E's silence. But this sort of unilateral modification is prohibited by the Agreement's terms, which provide that such terms may not be "waived, altered, modified, or added to unless such waiver, alteration, modification or addition is in writing and signed by an authorized representative of [RG&E] and [Andritz]." ECF No. 1-1 at 4. There is no such signed "writing" modifying Section 18's language to state that RG&E may terminate the agreement by its silence rather than "by giving [Andritz] twenty-four (24) hours['] notice." ECF No. 1-1 § 18. To the contrary, RG&E's first response to the letter indicates that it does not assent to such a modification and did not terminate the Agreement. ECF No. 1-8.[5]

Andritz relies on cases in which a party was deemed to have accepted an offer for purposes of contract formation by its silence. *See, e.g., John William Costello Assocs. v. Standard Metals Corp.,* 472 N.Y.S.2d 325, 327–28 (App. Div. 1984) ("An offer may be accepted by conduct or acquiescence . . . ." (collecting cases)). In these cases, there was at least some action by the silent

---

[5] To dispute RG&E's characterization of this letter and bolster its Complaint allegation that RG&E admitted to a Section 18 termination, Andritz cites RG&E's reference to Section 18 in the letter. ECF No. 15 at 21. RG&E, however, was merely citing that section in reference to its October 2008 *suspension* of the project pursuant to Section 18. ECF No. 1-8 at 2. Nowhere in the letter does RG&E admit to terminating the contract pursuant to Section 18, but instead it clearly states that it "never issued a termination notice under the . . . Agreement" and that its understanding was that Andritz terminated the Agreement. ECF No. 1-8 at 4. Simply stated, Andritz's interpretation of the April 16, 2020 letter is divorced from the plain text of the document.

party that signaled that party's assent to contract formation. *Id.* (noting that the defendant assented

to the terms of an offer letter by accepting "the benefits of the plaintiff's services"); *Westchester*

*Resco Co. v. New England Reinsurance Corp.*, 648 F. Supp. 842, 846 (S.D.N.Y. 1986) (holding

that parties' conduct, as well as past dealings between the parties and industry custom,

demonstrated assent).[6] Such cases are inapposite. Andritz has not alleged any conduct by RG&E

that indicates its assent to terminating the agreement. A contract may not be formed by silence

where the parties have agreed that it will be reduced to writing or where the silent party has no

duty to speak. *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 47 (App. Div. 2009) ("It is well settled that,

if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing

and signed by both of them, they are not bound and may not be held liable until it has been written

out and signed." (quoting *Jordan Panel Sys. Corp. v. Turner Constr. Co.*, 841 N.Y.S.2d 561, 562

(App. Div. 2007))); *Albrech Chem. Co. v. Anderson Trading Corp.*, 84 N.E.2d 625, 626 (1949)

("[W]here the recipient of an offer is under no duty to speak, silence, when not misleading, may

not be translated into acceptance merely because the offer purports to attach that effect to it."); *see*

---

[6] In the other case cited by Andritz, the Second Circuit found that a cover letter to a signed, written
agreement was improperly excluded from evidence where the letter was evidence that the plaintiff had
entered a written "contract in reliance upon the existence of [a] collateral oral agreement." *Hellenic Lines
Ltd. v. Gulf Oil Corp.*, 340 F.2d 398, 400 (2d Cir. 1965). The defendant "never disagreed with or took
exception to the condition contained in" the letter and sent a reply implying "approbation and accord." *Id.*
The Second Circuit found that the letter "was competent evidence to show that the written . . . contract was
not intended to become operative unless and until the separate oral contract of affreightment also became
operative." *Id.* at 401. The Second Circuit did note that the defendant's "reply could be found to imply
concurrence or, to the extent it failed to respond to the[] assertions [in the letter], under circumstances which
reasonably called for a reply, could be found to constitute an admission by silence." *Id.* The fact that the
letter provided evidence of a separate, oral agreement, supported by consideration, saved it from the
integration clause contained in the written agreement.

This case is not particularly relevant to Andritz's assertions because Andritz is not attempting to prove the
existence of an enforceable contract independent of the Agreement. Further, Andritz has not alleged the
existence of any reply that could be construed as concurrence to Andritz's modification of the Agreement.
To the contrary, the letter cited by Andritz expressly disclaims RG&E's termination of the Agreement
pursuant to Section 18.

*also Diarassouba v. Urban*, 892 N.Y.S.2d 410, 416 (App. Div. 2009) ("This Court has previously held that absent a duty to speak, one party's silence does not constitute acceptance . . . ." (collecting cases)). Similarly, a party's silence generally may not be considered acquiescence to the modification of an agreement where, as here, the parties have specified that such modifications must be in writing. *See Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) ("In general, [under New York law], a written agreement that expressly states it can be modified only in writing cannot be modified orally."[7]); *Stonebridge Cap., LLC v. Nomura Int'l PLC*, No. 602081/08, 2009 WL 2045621, at *8 (N.Y. Sup. Ct. July 6, 2009) (table decision) (equating alleged acceptance by silence to an impermissible oral modification of a contract).

Instead, Andritz's allegations suggest that it terminated the agreement, which it was permitted to do pursuant to Section 17 of its Proposal dated October 26, 2007 (the "Proposal"), which is expressly incorporated into the Agreement by reference.[8] ECF No. 1-1 at 4; ECF No. 9-3; *see Roc Nation LLC v. HCC Int'l Ins. Co.*, No. 19-CV-554, 2021 WL 827957, at *20 (S.D.N.Y. Mar. 4, 2021) ("Under New York law, an integrated written agreement includes documents that it expressly incorporates by reference, which are not considered extrinsic evidence of the agreement's meaning."). The Proposal's terms are "to be read consistently" with the Agreement

---

[7] The Second Circuit notes several inapplicable exceptions to this principle. *Towers Charter*, 894 F.2d at 522 (noting that an oral modification may be enforced either where "there has been partial performance of the agreement to modify, so long as the partial performance is unequivocally referable to the oral modification" or where "one party has induced the other party to rely on an oral modification" and the relevant conduct was "not otherwise . . . compatible with the agreement as written"). Andritz has not alleged that any such exception is applicable here.

[8] Although this document was not included as an attachment to Andritz's complaint, the Court may consider such a document in evaluating RG&E's motion to dismiss. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) ("It is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." (internal citations omitted)).

11

and other incorporated documents to the extent possible. ECF No. 1-1 at 4. Although in the event

of conflict the Agreement's terms control over the Proposal's terms, *id.*, there does not appear to

be a conflict between the Agreement and the Proposal in this regard as the Agreement does not

contain a provision prohibiting or otherwise restricting Andritz's rights to terminate the agreement.

ECF No. 1-1. The Proposal expressly permits termination at the convenience of Andritz "by notice

to" RG&E if work on the project "is stopped, suspended or otherwise delayed, for a period of 60

days or more, whether by reason of . . . a direction of [RG&E] . . . pursuant to [section in the

Proposal granting RG&E the right to suspend work at its convenience] or any other reason not

attributable to or as a result of fault of [Andritz]." ECF No. 9-3 at 46.

     Andritz premises its breach of contract claim entirely on Section 18 of the Agreement and

does not argue that it is entitled to recover costs under Section 17 of the Proposal. Accordingly,

Andritz's claim for breach of contract as stated is deficient as a matter of law and must be

dismissed. *Cf. Wolff v. Rare Medium, Inc.*, 65 F. App'x 736, 738 (2d Cir. 2003) (summary order)

("[P]laintiffs' identification of Article IV, section 4.4(a) as the provision breached by Rare

Medium is deficient as a matter of law because the plain language of that section imposes no

obligations on Rare Medium; it serves only to restrict plaintiffs' disposition of their exchanged

shares."). Accordingly, RG&E's motion to dismiss Andritz's claim for breach of the Agreement

is GRANTED.[9]

    B.    *The Agreement's Limitation of Liability*

     RG&E further argues that the Agreement's limitation of liability provision bars all of

Andritz's claims for monetary relief for hedging losses, including Andritz's claims for equitable

---

[9] Because the Court finds that Andritz has not alleged that RG&E terminated the Agreement pursuant to
Section 18, the Court declines to consider RG&E's alternative argument that currency hedging losses are
not "costs" recoverable under Section 18. ECF No. 9-1 at 17–22.

relief. ECF No. 9-1 at 24–25. The Agreement provides that neither party shall "be liable to the other or any of its affiliates related in any way to this Agreement or performance thereof for any incidental, special, indirect, punitive or consequential damages of any kind." ECF No. 1-1 at 17. "New York law enforces [a contractual limit of liability] clause because it represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *My Play City, Inc. v. Conduit Ltd.*, 589 F. App'x 559, 562 (2d Cir. 2014) (summary order) (internal quotation marks omitted). Accordingly, the Court must determine if there is any ambiguity regarding whether currency hedging costs fall within any of those categories. Andritz alleges and argues, *inter alia*, that such costs are direct damages arising from RG&E's conduct. ECF No. 1 ¶¶ 49, 53; ECF No. 15 at 31–33.

New York courts generally draw a distinction between "general (or direct) damages, which compensate for the value of the promised performance, and consequential damages, which are indirect and compensate for additional losses incurred as a result of the breach." *Appliance Giant, Inc. v. Columbia 90 Assocs., LLC*, 779 N.Y.S.2d 611, 613 (App. Div. 2004); *see also In re CCT Commc'ns, Inc.*, 464 B.R. 97, 116 (Bankr. S.D.N.Y. 2011) ("General damages are synonymous with 'direct' damages . . . and provide the aggrieved party with the difference between the price he agreed to pay and the value he was to receive through performance. . . . 'Consequential,' 'special' and 'indirect' damages are synonymous terms that 'seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach.'" (internal citations and quotation marks omitted)).

Other New York courts have defined direct damages as "those which are the natural and probable consequence of the breach." *Am. List Corp. v. U.S. News & World Report, Inc.*, 549

N.E.2d 1161, 1164 (N.Y. 1989); *see also Phoenix Warehouse of Cal., LLC v. Townley, Inc.*, No. 08-CV-2856, 2011 WL 1345134, at *5 (S.D.N.Y. Mar. 29, 2011) ("The key consideration is not whether the breaching party could have foreseen that its counterparty might suffer the damages in question, but whether it 'contemplated at the time of the contract's execution that it assumed legal responsibility for these damages upon a breach of the contract.'" (quoting *Kenford Co. v. Cnty. of Erie*, 537 N.E.2d 176, 179 (N.Y. 1989)). "The distinction between general and special contract damages is well defined but its application to specific contracts and controversies is usually more elusive." *Biotronik A.G. v. Conor Medsystems Ir., Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014). Generally, "the precise demarcation between direct and consequential damages is a question of fact." *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976).

The parties have identified no case law, and the Court has found none, classifying losses associated with currency hedging contracts as either direct or consequential damages. *But see Top of Iowa Coop. v. Schewe*, 6 F. Supp. 2d 843, 858–59 (N.D. Iowa 1998) (finding that costs incurred on margin calls for plaintiff's hedge positions related to corn delivery contract were reliance damages where defendant failed to deliver corn and "recovery of such damages would place [plaintiff] in the position it would have occupied had [defendant] performed the contracts"); *In re A & B Assocs., L.P.*, No. 17-40185, 2019 WL 1470892, at *4–5, *39–40 (Bankr. S.D. Ga. Mar. 29, 2019) (finding "no basis for holding" debtor responsible for hedge losses incurred from third-party contracts as "consequential damages" where lender was required to maintain hedge pursuant to third-party agreement, debtor was not a party to the hedge contract, and the loan agreement did not expressly reference lender's "intention to hedge its losses").

Andritz has alleged that the "practice of purchasing foreign currency hedging contracts to protect against currency fluctuations is a standard practice in international contracting" and that

the losses Andritz incurred thereby were "actual, hard-dollar costs incurred by Andritz as a result of RGE's prolonged suspension and eventual termination of the Agreement." ECF No. 1 ¶¶ 15, 49. The Court must accept these allegations as true and finds that they are sufficient to demonstrate that the losses incurred by Andritz were "natural and probable consequence of the breach," and thus direct damages that are not barred by the Agreement's limitation of liability clause. *Am. List Corp.*, 549 N.E.2d at 1164. Further, even if the damages requested were consequential damages under a contractual theory of liability, it is not clear that the damages would be so classified under an equitable theory of recovery. *See In re Lyondell Chem. Co.*, 544 B.R. 75, 91–92 (Bankr. S.D.N.Y. 2016) (finding that restitution under an unjust enrichment claim was "distinct in character from special or consequential damages").

RG&E further argues that Section 3.4 of the Proposal "makes it clear that the parties did not contemplate that Andritz would incur such losses." ECF No. 9-1 at 24. Section 3.4 provides: "The Contract Price shall be payable in Canadian Dollars and is further subject to modification to the extent of any change of foreign exchange rates (if so specified in our offer) if the Release for Manufacture is delayed beyond that quoted." ECF No. 9-3 at 43. RG&E claims that this provision protects Andritz in the event of currency price fluctuations and that, accordingly, the hedges were unnecessary and allowing recovery for hedging costs would render Section 3.4 superfluous. ECF No. 9-1 at 19–22, 24.

The Proposal, however, is secondary to the Agreement, which directly conflicts with Section 3.4 in that it provides "that the prices stated on the face of the Purchase Order shall be considered firm unless otherwise noted." ECF No. 1-1 at 4, 6. The Purchase Order provides the price in United States Dollars, not Canadian. ECF No. 9-4 at 3.[10] The Agreement's "firm unless

---

[10] RG&E argues that Section 3.4 of the Proposal only applies if the purchase price was quoted in a foreign currency and points out that the value of Section 3.4 to Andritz, a company that does business in Canadian

otherwise noted" language suggests some ambiguity as to whether it overrides the Proposal's Section 3.4 provision permitting a variable purchase price, but even setting aside that ambiguity, the variable purchase price provision is only triggered if "the Release for Manufacture is delayed beyond that quoted" and "if so specified" in Andritz's offer. ECF No. 9-3 at 43. RG&E has not shown that the variability provision was "so specified" in Andritz's offer and even if it was, hedging contracts might still be necessary if exchange rates fluctuated prior to "Release for Manufacture" where that event was not "delayed beyond that quoted" (thus leaving Andritz unprotected from the fluctuation). *Id.*; ECF No. 1 ¶ 15 (alleging that the "practice of purchasing foreign currency hedging contracts to protect against currency fluctuations is a standard practice in international contracting"). Accordingly, at this stage, the Court cannot find that Section 3.4 of the Proposal demonstrates that Andritz cannot recovery currency hedging losses under the Agreement.

That is not to say the Court does not have doubts regarding Andritz's position. *See PNC Bank, Nat'l Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 373–74 (S.D.N.Y. 2014) (finding, at summary judgment, that refunds a party paid to third-parties could not "fairly be termed general damages, reflecting the value of the very performance promised," because it was "undisputed that [plaintiff] elected to make these payments on its own," "[n]o provision of its contract [with the defendant] obliged it do so," and the defendant "played no part in [it]s decision to do so" (internal quotation marks omitted)). For instance, generally lost profits are considered

---

Dollars, would be questionable if the purchase price was quoted in Canadian Dollars (because there would be no need for Andritz to adjust the purchase price to account for foreign currency exchange rate fluctuations). ECF No. 9-1 at 19; ECF No. 15 at 12. RG&E's interpretation, however, conflicts with the text of the Proposal and, given that Andritz allegedly was acquiring "certain high-value items and engineering from . . . Europe in foreign currency," a purchase price quoted in Canadian Dollars would not completely eliminate Andritz's risk of foreign currency exchange rate fluctuations. ECF No. 1 ¶ 17; ECF No. 9-3 at 43.

consequential damages where "the non-breaching party suffers loss of profits on collateral business arrangements," *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007); *Biotronik A.G.*, 11 N.E.3d at 681–82 ("The distinction at the heart of [various loss of profit] cases is whether the lost profits flowed directly from the contract itself or were, instead, the result of a separate agreement with a nonparty." (collecting cases)), a concept which at least appears analogous to the collateral currency hedging contracts at issue here. The Court, however, finds that Andritz has sufficiently alleged that the currency hedging costs are generally associated with international contracting and flow directly from the alleged conduct of RG&E. Accordingly, the Agreement's limitation of liability clause does not bar recovery of currency hedging losses.

### III.    Quasi-Contract Claims

RG&E broadly attacks Andritz's claims for breach of an implied-in-fact contract, unjust enrichment, and promissory estoppel (collectively "quasi-contract claims")[11] as barred by the Agreement. ECF No. 9-1 at 23.[12] Andritz argues that it may plead its quasi-contract claims in the

---

[11] Although not sufficiently addressed by the parties, a claim for breach of an implied-in-fact contract is distinct from a quasi-contractual claim, and a valid, implied-in-fact contract actually precludes claims sounding in quasi contract. *See Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006). However, because RG&E's argument regarding Andritz's quasi-contractual claims—including its claim for breach of an implied-in-fact contract—turn on whether those claims concern the same subject matter as the Agreement, the Court may analyze these distinct claims collectively. *See Saeed v. Kreutz*, 606 F. App'x 595, 597 (2d Cir. 2015) (summary order) ("Because the CBA and the alleged implied-in-fact contract concerned *the same subject matter*—i.e., the terms and conditions of employment—the implied contract claim fails as a matter of law." (emphasis added)). The Court notes that the "same subject" matter inquiry is at least arguably more forgiving in the context of an implied-in-fact contract, *compare id.* at 598 (noting that implied-in-fact contract claim would fail even if express contract were "entirely silent on the" relevant issue), *with Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 594 N.Y.S.2d 144, 146 (App. Div. 1993) (permitting quantum meruit claim to proceed where express contract was silent on relevant issue), but at this early stage and because neither party has drawn distinctions between these various claims, the Court finds that this matter is distinct from *Saeed* and that it may analyze these claims collectively. 606 F. App'x at 597 (noting express term of the agreement provided that it encompassed relevant subject matter).

[12] RG&E does not argue that Andritz failed to allege the individual elements of these respective claims. The Court accordingly declines to examine this issue *sua sponte*. *Naples v. Stefanelli*, 972 F. Supp. 2d 373, 400 (E.D.N.Y. 2013) ("[W]hether [p]laintiffs have adequately pled the other elements of a libel or slander

alternative and that those claims and its contract claim are not mutually exclusive. ECF No. 15 at 33–35.

"[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 654 (E.D.N.Y. 2012) (internal quotation marks omitted); *Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) ("New York state courts, federal courts in our district, and the Second Circuit have held the existence of a valid and enforceable contract precludes an unjust enrichment claim relating to the subject matter of the contract." (collecting cases)); *Hartford Fire Ins. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 993 (S.D.N.Y. 1989) ("Faced with a comprehensive contract . . . authorizing [defendant]'s conduct, the [p]laintiffs cannot invoke promissory estoppel to avoid its enforcement.").

There is no dispute here that the parties had a valid and enforceable written contract. This is not a case in which any party is challenging the Agreement's validity. *See Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 458–59 (S.D.N.Y. 2016) ("While the existence of a contract generally bars recovery based on the quasi-contract theory of unjust enrichment, a claim for unjust enrichment may survive a motion to dismiss where the plaintiff challenges the contract's validity." (collecting cases) (internal citation omitted)). Accordingly, the relevant question for the Court is whether the quasi-contract claims seek recovery for events arising out of the same subject matter as the Agreement.

Where a "contract does not bar the plaintiff from recovery, it cannot be said that the dispute is to be determined pursuant to the terms of a valid and subsisting contract, such that plaintiff is

---

claim were not raised by the [d]efendants [in their motion to dismiss], and the Court will not address these arguments *sua sponte*.").

barred from proceeding on a theory of" quasi contract. *Joseph Sternberg, Inc. v. Walber 36th St. Assocs.*, 594 N.Y.S.2d 144, 146 (App. Div. 1993) (finding that, where contract was "silent as to the plaintiff's entitlement to a commission in the event" of a certain contingency, the plaintiff could simultaneously proceed on a theory of quantum meruit and breach of contract). "[C]ourts generally dismiss claims [sounding in quasi contract] on the pleadings only when it is clear from the face of the complaint that there exists an express contract that *clearly controls*." *Knudsen v. Quebecor Printing (U.S.A.) Inc.*, 792 F. Supp. 234, 237 (S.D.N.Y. 1992) (emphasis added).

Andritz claims that its quasi-contract claims arise out of RG&E's post-suspension conduct. ECF No. 15 at 34–35. At this stage, it is not clear to the Court that any provisions of the Agreement "clearly controls" the determination of whether Andritz can recover currency hedging losses based on RG&E's post-suspension conduct. *See Union Bank, N.A. v. CBS Corp.*, No. 08-CV-8362, 2009 WL 1675087, at *8 (S.D.N.Y. June 10, 2009) (declining to rule on quasi-contract claim where, even though both parties argued that they should prevail under the relevant agreements, "the Court could later conclude that these agreements do not address the events that took place here"). Here, the Agreement does not appear to contemplate the allocation of currency hedging losses after an RG&E suspension lasting more than a decade; in fact, the Agreement is silent regarding those costs generally. ECF No. 9-1 at 18–19 (noting that Section 3.4 of the Proposal contains the only language in the "Agreement that speaks to the issue of currency fluctuation"); *see Vertex Constr. Corp. v. T.F.J. Fitness L.L.C.*, No. 10-CV-683, 2011 WL 5884209, at *4 (E.D.N.Y. Nov. 23, 2011) ("[B]ecause it is difficult to determine the . . . scope of the contract at the pleading stage, courts routinely reject arguments [that a contract forecloses a quasi-contract claim] as premature."); *cf. Gemma Power Sys., LLC v. Exelon W. Medway II, LLC*, No. 19-CV-705, 2019 WL 3162088, at *10 (S.D.N.Y. July 1, 2019) (dismissing quasi-contract claim on motion for judgment on the

pleadings where each dispute could be "resolved with reference to particular specific provisions of the [c]ontract"). Accordingly, RG&E's motion to dismiss Andritz's quasi-contract claims is DENIED.

## CONCLUSION

RG&E's motion to dismiss the complaint, ECF No. 9, is GRANTED IN PART and DENIED IN PART. Andritz's breach of contract and declaratory judgment claims are DISMISSED, but Andritz's implied-in-fact contract, unjust enrichment, and promissory estoppel claims may proceed.

IT IS SO ORDERED.

Dated: July 21, 2021
　　　Rochester, New York

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　HON. FRANK P. GERACI, JR.
　　　　　　　　　　　　　　　　　　　　　United States District Judge
　　　　　　　　　　　　　　　　　　　　　Western District of New York